

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-17-2003

# McCurdy v. Dodd

Precedential or Non-Precedential: Precedential

Docket No. 02-2708

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"McCurdy v. Dodd" (2003). *2003 Decisions*. Paper 10.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/10

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed December 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2708

BOBBY McCURDY,

Appellant,

v.

KIRK DODD, Badge No. 1762 Individually and as a police
officer for the Philadelphia Police Department;
CHRISTOPHER DiPASQUALE, Badge No. 4971 Individually
and as a police officer for the Philadelphia Police
Department; JOHN MOUZON, Badge No. 5293
Individually and as a police officer for the Philadelphia
Police Department; DAVE THOMAS, Badge No. 1762
Individually and as a police officer for the Philadelphia
Police Department; SCOTT WALLACE, Badge No. 3434
Individually and as a police officer for the Philadelphia
Police Department; CITY OF PHILADELPHIA,

Appellees.

CITY OF HARRISBURG; CITY OF PITTSBURGH; CITY OF
NEWARK; CITY OF CAMDEN,

Amici-Appellees

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

District Court Judge: The Honorable Clifford Scott Green
(99-CV-5742)

Argued on July 23, 2003

BEFORE: ALITO, FUENTES, and BECKER, *Circuit Judges*

(Opinion filed: December 17, 2003)

———————

Richard A. McDaniel (argued)
Suite 1910
1616 Walnut Street
Philadelphia, PA 19103

   *Attorney for Appellant*

Jane L. Istvan (argued)
City of Philadelphia
Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

   *Attorney for Appellees Kirk Dodd,
John Mouzon, Dave Thomas,
Scott Wallace and the City of
Philadelphia*

Richard G. Tuttle (argued)
Kolansky, Tuttle, & Rocco
1429 Walnut Street
Suite 1300
Philadelphia, PA 19102

   *Attorney for Appellee
Christopher DiPasquale*

Sarah E. Ricks
Rutgers University School of Law
217 North Fifth Street
Camden, NJ 08102

   *Attorney for Amici-
Appellees*

## OPINION OF THE COURT

FUENTES, *Circuit Judge*:

This controversy arises out of the tragic and fatal shooting of Donta Dawson ("Dawson" or the "decedent") in an encounter with officers of the Philadelphia Police Department. Dawson's biological father, Bobby McCurdy ("McCurdy"), appeals the grant of summary judgment in favor of the defendants as to McCurdy's sole remaining claim from an action brought pursuant to 42 U.S.C. § 1983. McCurdy invoked the Due Process Clause of the Fourteenth Amendment and asserted that defendants had violated his parental liberty interest in the companionship of his independent adult son.

The District Court granted summary judgment on the ground that McCurdy was precluded from bringing his § 1983 action after he had entered into an agreement with Dawson's mother to share the proceeds from her settlement of a prior civil action against the same defendants here. We find, however, that there is a controlling, threshold issue which obviates the need to address preclusion: that is, whether McCurdy has adequately asserted the violation of a cognizable constitutional right. Because the Due Process Clause does not protect the interest of a parent in the companionship of his or her independent adult child, we will affirm the judgment of the District Court.

## I.

### A.

On the night of October 1, 1998, Donta Dawson was sitting alone in a parked car, with the engine running, on 12th Street near Glenwood Avenue in Philadelphia. The headlights and interior lights were on, and the radio was audible. Philadelphia Police officers Kirk Dodd and Christopher DiPasquale spotted Dawson's vehicle and pulled up alongside it. Officer Dodd inquired why Dawson was parked on the street and whether he needed any

assistance. According to the officers, Dawson looked at them and then looked away without responding.

Officer Dodd exited the patrol car and approached Dawson on the driver's side of the car. He asked Dawson again whether he needed help. Dawson looked at Officer Dodd, shrugged his shoulders, and turned away. The encounter rapidly escalated from there. The officers demanded that Dawson raise his hands, at times yelling obscenities to emphasize their point. Dawson did not respond. Officer DiPasquale drew his weapon and positioned himself by the hood of the patrol car.

While holding down Dawson's left arm, officer Dodd reached in and removed the key from the ignition. He then drew his weapon and pointed it directly at Dawson. Repeated demands to show his hands were met with Dawson's silence. Officer Dodd then attempted to pull Dawson's left arm up without success. As he retreated, he told officer DiPasquale that Dawson had a gun.

After further demands that he raise his hands, Dawson finally began to move his left arm. Officer DiPasquale then fired his weapon, fatally shooting Dawson in the head. A subsequent investigation revealed that Dawson was unarmed.

Although the familial relationships between the decedent and his parents are important to this case, the factual record is disturbingly incomplete in material respects.[1] Dawson was the son of Cynthia Dawson and Bobby McCurdy. McCurdy and Cynthia Dawson apparently never married. It also appears as if Ms. Dawson raised her son as

---

1. According to defendants, these gaps in the factual record are directly attributable to McCurdy's failure to respond to their Requests for Admission, served on two separate occasions. *See* Brief of Appellees Kirk Dodd, John Mouzon, Dave Thomas, Scott Wallace and the City of Philadelphia, at 7 n.1. Because of McCurdy's failure to do so, the defendants contend that the factual assertions in the Requests should be deemed admitted. *See id.* (citing *McNeil v. AT&T Universal Card*, 192 F.R.D. 492, 494 (E.D. Pa. 2000)). The District Court did not reach this issue, and we find it unnecessary to do so here. Nevertheless, our factual recitation is based in part on reasonable inferences drawn from the supporting documents, including the Requests for Admission.

a single mother. McCurdy did not provide any meaningful financial support to the decedent.[2] The defendants' assertion that McCurdy never listed his son as a dependent on his income tax returns was not contested. It is unclear whether McCurdy ever resided with his biological son and whether he performed any parental duties during Dawson's youth.

Some aspects of the familial relationships, however, are undisputed. In the years before his death, Dawson had minimal contact with his father because McCurdy had been incarcerated since 1996. At the time of the shooting, Dawson was nineteen years old. App. at 11. There is no dispute that Dawson was an independent adult, single and without any children of his own.

## B.

Prior to the District Court's summary judgment disposition, there were a number of other proceedings that relate to the present appeal. Approximately six months after Dawson's fatal encounter with the police, Cynthia Dawson, on her own behalf and as administratrix of her son's estate, filed a civil action in state court against the City of Philadelphia and several officers of the Philadelphia Police Department, including officers Dodd and DiPasquale. She asserted six causes of action. The first three alleged violations of Dawson's civil rights. The fifth and sixth causes of action, also on behalf of Dawson, were brought pursuant to the Pennsylvania survival and wrongful death statutes, respectively. *See* 42 Pa. Cons. Stat. Ann. §§ 8301, 8302. Her fourth cause of action, however, asserted the

---

2. At oral argument, we gave McCurdy's counsel ample opportunity to bring to our attention specific facts relating to the nature of the father-son relationship, but he was unable to provide any information that would dispute the defendants' contention that McCurdy failed to play a substantial role in raising Dawson. Counsel stated on the record that McCurdy once sent a nominal sum of money to Dawson, which McCurdy received from the settlement of a civil action that he brought while incarcerated. No verification of this one-time payment, or any other indications that McCurdy was a substantial father figure to Dawson, appears in the appellate record.

violation of her own constitutional rights for the loss of companionship of her son. At the outset, McCurdy was not a party to this action.

The defendants removed Ms. Dawson's action to federal court. Upon the filing of answers, the defendants settled the matter for a total of $712,500. On July 28, 1999, Ms. Dawson executed an agreement, releasing the defendants from all claims arising out of the death of her son. Ms. Dawson then filed a petition for leave to settle the action and requested an order approving her proposed distribution of the settlement proceeds.[3] The District Court granted Ms. Dawson's petition in part, permitted the settlement of the action and the payment of attorneys' fees and costs, but denied her request to determine an appropriate distribution of the settlement proceeds. The denial of the distribution plan was entered without prejudice to the filing of an application in state court for approval of the plan.

Ms. Dawson filed a petition for approval of the distribution plan in state court in August 1999. In her petition and supporting memorandum, Ms. Dawson contended that McCurdy had forfeited any right or interest in the settlement proceeds because, among other things, he failed to perform any parental functions or to provide any financial support. Shortly thereafter, McCurdy filed an unsigned objection to Ms. Dawson's petition and a similarly unsigned memorandum of law in support of his objections.

While the distribution of the settlement proceeds was pending, McCurdy filed his own separate action in state court, which commenced the proceedings at issue in this appeal. McCurdy's complaint, filed on October 26, 1999, was substantially similar to Ms. Dawson's complaint. The first three causes of action alleged violations of Dawson's civil rights. His fourth cause of action was almost identical to Ms. Dawson's, except that it asserted a violation of

_____

3. Ms. Dawson's proposal called for the following distribution of proceeds: $450,000 to Ms. Dawson, individually, for the violation of her constitutional rights; $23,412 to Ms. Dawson as sole beneficiary of the wrongful death action; $23,412 to the estate of Donta Dawson in settlement of the survival claim; $213,750 in attorneys' fees; and $1,925 in costs.

McCurdy's own constitutional rights for the loss of companionship of his son.

The defendants removed McCurdy's action to the District Court on November 18, 1999 and promptly filed motions to dismiss. The District Court granted the motions to dismiss the first three causes of action. The Court held that Ms. Dawson, as administratrix of her son's estate, was the only proper party to bring claims on behalf of the decedent. *See McCurdy v. Dodd*, No. 99-CV-5742, 2000 WL 250223 (E.D. Pa. Feb. 28, 2000), at *2. The Court denied, however, the motion to dismiss the fourth cause of action for the deprivation of McCurdy's constitutional rights. In pertinent part, the Court held that "[o]ur Court of Appeals has held that a parent whose child has died as a result of unlawful state action may, in certain circumstances, maintain an action under section 1983 for the deprivation of his liberty interest in parenthood." *Id.* (citing *Estate of Bailey by Oare v. York County*, 768 F.2d 503, 509 n.7 (3d Cir. 1985) (hereinafter "*Bailey*")). Having determined that McCurdy could continue with his Due Process claim based on the loss of companionship of his adult child, the Court directed the parties to proceed with discovery as to McCurdy's sole remaining claim.

Meanwhile, the Court of Common Pleas of Philadelphia, Orphan's Court Division, scheduled a hearing with regard to Ms. Dawson's petition to approve her distribution plan. After the hearing, Ms. Dawson and McCurdy agreed to settle their dispute as to the proper allocation of the settlement proceeds arising out of Ms. Dawson's civil action. Therefore, on July 11, 2000, the court entered a decree approving a modified distribution plan reflecting the agreement reached between Dawson's parents. Specifically, Ms. Dawson was awarded $256,000 for her individual constitutional claim. The balance of the proceeds, derived from Ms. Dawson's wrongful death claim, was allocated to Dawson's estate, which both parents were entitled to share in equal portions pursuant to statute. Thus, McCurdy and Ms. Dawson were awarded $123,154 each. Consistent with the decree, McCurdy then executed an agreement with Ms. Dawson, releasing her and the estate from all claims arising out of Dawson's death.

Based on these events, the defendants in McCurdy's action filed motions in the District Court for summary judgment. Among other things, the defendants argued that McCurdy's acceptance of his statutory share of the estate proceeds and his settlement of the dispute with Ms. Dawson precluded his constitutional claim in the District Court action. In addition, the defendants contended that McCurdy lacked standing to bring his fourth cause of action because there was no recognized constitutional right of parents to the companionship of their independent adult children. The District Court agreed that McCurdy's constitutional claim was precluded. It held that "Plaintiff [ ] accepted part of the funds attributed to the Wrongful Death Action, and executed a release. The claims Plaintiff pursues in the instant action for 'familial companionship' are the same as the claims brought by Ms. Dawson . . . . Therefore, in partaking of those funds, Plaintiff's instant claims have been satisfied, and must be dismissed." *McCurdy v. Dodd*, No. 99-CV-5742, 2002 WL 1019004 (E.D. Pa. May 20, 2002), at *3. The Court did not address the defendants' renewed argument that the Constitution does not protect the interest of parents in the companionship of their adult children. McCurdy's appeal followed, and the defendants now urge us to consider the novel constitutional question.[4]

## II.

The District Court had jurisdiction over the underlying action pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction to review the final order of the District Court pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *See Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002).

---

4. The cities of Newark, Camden, Harrisburg and Pittsburgh have filed a joint amicus brief urging us to do the same.

## III.

### A.

In his sole remaining claim, McCurdy alleges that, as a parent, he has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment in the companionship of his son. According to McCurdy, when officer DiPasquale shot and killed Dawson, the defendants violated his parental rights. He seeks to hold the defendants liable for this purported violation pursuant to 42 U.S.C. §§ 1983 and 1988.

Section 1983, enacted as part of the Civil Rights Act of 1871, establishes "a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981) (citation omitted). In *Wyatt v. Cole*, the Supreme Court stated that the "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." 504 U.S. 158, 161 (1992) (citation omitted). While § 1983 establishes the statutory vehicle for liability for constitutional violations, the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also id.* at 719 ("The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint") (citations omitted).

Although we are mindful of the broad remedial purposes of § 1983, we must also recognize that, in § 1983 cases grounded on alleged parental liberty interests, we are venturing into the murky area of unenumerated constitutional rights. *See Troxel v. Granville*, 530 U.S. 57, 92 (2000) (Scalia, J., *dissenting*). For this reason, where liberty interests are asserted as a basis for liability pursuant to § 1983, courts have consistently undertaken a threshold inquiry at the onset of litigation: "First, courts must address the threshold issue in any action brought

under § 1983: 'whether the plaintiff has alleged the deprivation of an actual constitutional right at all.' " *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)); *see also Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The purpose of the initial inquiry is to streamline the process of reasoned decisionmaking. "[B]y establishing a threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the action, it avoids the need for complex balancing of competing interests in every case." *Glucksberg*, 521 U.S. at 722.

This threshold inquiry requires us to identify the alleged due process right at issue carefully and precisely. *See id.* at 721; *see also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 400 (3d Cir. 2000) ("The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field") (internal quotation marks and citations omitted). The contours of legal concepts such as liberty interests and fundamental rights are amorphous and indistinct; therefore, we have cautioned that "[a]ddressing the substantive due process claim . . . requires scrupulous attention to the guideposts that have previously been established." *Id.* at 400. As the Supreme Court noted in *Glucksberg*: "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." 521 U.S. at 720 (internal quotation marks and citations omitted).

It is by now well-settled that the Due Process Clause protects certain narrowly defined fundamental rights of parents in their relationships with their children. There are substantive and procedural components to parental liberty interests. In *Troxel*, the Supreme Court addressed the constitutionality of a Washington state statute which permitted "any person" to petition a court for visitation

rights "at any time," when such visitation would "serve the best interest of the child." 530 U.S. at 60. In that dispute, the Washington Superior Court had granted visitation rights to the grandparents of two minor children in a manner contrary to the wishes of the children's mother. *Id.* at 61. The Supreme Court held the statute unconstitutional as applied in that case because it violated the mother's substantive due process rights. *Id.* at 72. In so doing, the Court observed that the "liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65. The Court elaborated that the essence of the liberty interest was the right of parents to "make decisions" concerning the rearing of their children. *Id.* at 66; *see also Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986) ("The emphasis in these cases on *choice* suggests that the right is one of preemption; rather than an absolute right to a certain family relationship, family members have the right, when confronted with the state's attempt to make choices for them, to choose for themselves") (emphasis in original).

The plurality in *Troxel* relied on a line of cases which recognized the due process right of parents to make critical decisions about the upbringing of their children. *See id.* at 65 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399-401 (1923) (holding that the Due Process Clause protects the right of parents to "establish a home and bring up children" and "to control the education of their own"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (referring to the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (recognizing a parental liberty interest in the "custody, care and nurture of the child")).

In *Bailey*, we also recognized a "cognizable liberty interest in preserving the life and physical safety of [a minor child] . . . a right that logically extends from [a parent's] recognized liberty interest in the custody of his children and the maintenance and integrity of the family." 768 F.2d at 509 n.7. In *Bailey*, the biological father of a five-year-old girl brought suit under § 1983 when the York County

Children and Youth Services returned his daughter to the custody of her mother. *Id.* at 505. The young girl died a month later from injuries inflicted on her by her mother and her mother's "paramour." *Id.* Supreme Court and Third Circuit precedents are clear in one respect: the cases extending liberty interests of parents under the Due Process Clause focus on relationships with *minor* children.

Some cases involving due process rights of parents have a procedural component as well. In *Stanley v. Illinois*, the Supreme Court invalidated an Illinois statute which presumptively treated unwed fathers as unfit parents, without an individualized hearing. 405 U.S. 645, 646, 656-57 (1972). In that case, the father's liberty interest was defined as "the interest of a parent in the *companionship*, care, custody, and management of his or her children." *Id.* at 651 (emphasis added). The procedural component of parental due process rights, therefore, requires rigorous adherence to procedural safeguards anytime the state seeks to alter, terminate, or suspend a parent's right to the custody of his minor children. *See id.* at 656-57; *see also Burgos*, 807 F.2d at 8. Although the Court in *Stanley* referred to a parent's interest in the "companionship" of his children, they did not indicate that it intended to depart from the framework established in the substantive due process cases, which limited the parental liberty interest to decisionmaking regarding the care, custody, and control of minor children. *See Butera*, 235 F.3d at 655.

In addition to these guideposts, we also note that the Due Process Clause does not condemn every conceivable state action that affects a fundamental right in any way. In *Daniels v. Williams*, the Supreme Court made it clear that the "Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." 474 U.S. 327, 328 (1986) (emphasis in original). The Court went on to explain that the due process guarantee has historically been applied only to "*deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Id.* at 331 (emphasis in original). In the context of parental liberty interests, this limitation means that the Due Process Clause only protects against deliberate violations of a

parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship. *See Burgos*, 807 F.2d at 8 ("But we think it significant that the Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with a child. The Court has never held that governmental action that affects the parental relationship only incidentally—as in this case—is susceptible to challenge for a violation of due process").

**B.**

With these guiding principles in mind, we turn to the specific due process right which McCurdy asserts here. He claims that, as a father, he has a protected liberty interest in the companionship, care, and affection of his independent adult son. Defined as such, there are a number of problems immediately apparent with McCurdy's purported due process right. First, the Supreme Court has never considered whether parental liberty interests extend to the companionship of independent adult children.[5] As we noted above, the Court's parental liberty cases have exclusively dealt with the right to make critical child-rearing decisions concerning the care, custody, and control of minors. *See Troxel*, 530 U.S. at 66. Second, despite McCurdy's attempt to characterize his due process right as settled law in this Circuit, we have never recognized a parental liberty interest as broad as the one McCurdy proposes. His reliance on *Bailey* is misplaced. 768 F.2d at 509 n.7. As we noted, *Bailey* concerned a father's liberty interest in "preserving the life and physical safety" of his five-year-old daughter. *Id.* at 505, 509 n.7. Thus, *Bailey* must be understood as consistent with and derived from the existing Supreme Court precedents establishing a

---

5. On two occasions, the Court granted review in cases where the issue might have arisen, but subsequently dismissed certiorari as improvidently granted. *See Espinoza v. O'Dell*, 633 P.2d 455 (Colo.), *cert. granted*, 454 U.S. 1122 (1981), *cert. dismissed*, 456 U.S. 430 (1982); *Jones v. Hildebrant*, 550 P.2d 339 (Colo. 1976), *cert. granted*, 429 U.S. 106, *cert. dismissed*, 432 U.S. 183 (1977).

parental interest in the care, custody, and control of minor children, not as supporting the leap McCurdy seeks to make.[6]

Third, we note that the Courts of Appeals are divided on the issue of whether the Due Process Clause protects a parent's right to the companionship of his or her adult son. McCurdy correctly observes that the Courts of Appeals for the Seventh and Tenth Circuits have recognized the parental liberty interest he asserts here. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1244-45 (7th Cir. 1984); *Trujillo v. Board of County Comm'rs of Santa Fe County*, 768 F.2d 1186, 1189 (10th Cir. 1985). Nevertheless, the Courts of Appeals for the District of Columbia and First Circuits have held that due process protections do not extend to a parent's liberty interest in the relationship with his or her adult child. *See Butera*, 235 F.3d at 655-56; *Burgos*, 807 F.2d at 8-9.

Given the guideposts to which we must pay strict adherence, we believe that, for several reasons, a broad expansion of due process protections to encompass McCurdy's proposed definition is unwarranted in this case. First, we return once more to the parental liberty interest as defined by the Supreme Court. That interest concerns the right of parents to make critical child-rearing decisions

---

6. In fact, in two decisions after *Bailey*, we were presented with the issue but declined to rule upon it. *See Schieber v. City of Philadelphia*, 320 F.3d 409, 423 n.6 (3d Cir. 2003) ("I also express no view on whether the Schiebers, as parents, had a liberty interest in the continued companionship of their adult, emancipated child"); *Freedman v. City of Allentown*, 853 F.2d 1111, 1117 n.5 (3d Cir. 1988) ("In light of our disposition, we do not reach the issue of whether parents of an adult decedent may maintain a section 1983 claim").

We recognize, however, that a number of district courts in our Circuit have misinterpreted *Bailey* to mean that parental liberty interests in fact extend to the companionship of independent adult children. *See, e.g.*, *Estate of Cooper By and Through Cooper v. Leamer*, 705 F. Supp. 1081, 1087 (M.D. Pa. 1989); *Agresta v. Sambor*, 687 F. Supp. 162, 162-64 (E.D. Pa. 1988). The prevalence of this misinterpretation is evident in the District Court's decision on the defendants' motions to dismiss the complaint, where the Court held that McCurdy has a protected liberty interest in the companionship of his son. *McCurdy*, 2000 WL 250223, at *2.

concerning the care, custody, and control of minors. *Troxel*, 530 U.S. at 66. So defined, this fundamental right cannot exist indefinitely. By its very definition, it must cease to exist at the point at which a child begins to assume that critical decisionmaking responsibility for himself or herself. We recognize that the Due Process Clause is not a rigid phrase, fixed in time and substance. In *Bell*, the Seventh Circuit was "unpersuaded that a constitutional line based solely on the age of the child should be drawn." 746 F.2d at 1245. Although we share some of the *Bell* court's concerns, we believe that the more serious mistake would be to extend the liberty interests of parents into the amorphous and open-ended area of a child's adulthood. In that regard, we agree with the District of Columbia Circuit that childhood and adulthood are markedly distinct, thus requiring different constitutional treatment in this context. In *Butera*, the court observed that:

> When children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes. At the same time, the strength and importance of the emotional bonds between them and their parents usually decrease. Concededly, the bond between a parent and child when the child is an adult usually bears some resemblance to the same bond when the child was a minor. But, as a long line of Supreme Court cases attests, the differences between the two stages of the relationship are sufficiently marked to warrant sharply different constitutional treatment.

235 F.3d at 656 (quoting *Franz v. United States*, 712 F.2d 1428, 1432 (D.C. Cir. 1983)).

In addition, we are hesitant to extend the Due Process Clause to cover official actions that were not deliberately directed at the parent-child relationship, in disregard of the Supreme Court's admonition in *Daniels*, 474 U.S. at 665. For this reason, the court in *Burgos* declined "to make the leap ourselves from the realm of governmental action directly aimed at the relationship between a parent and a young child to an incidental deprivation of the relationship between appellants and their adult relative." 807 F.2d at 9. To be clear, we realize that it would be unjust to

characterize the tragic events in the case as incidental or not deliberate. When officer DiPasquale discharged his weapon, the act itself was intentional. As a consequence, Dawson's life ended in a senseless way, and the bonds between parent and child were irretrievably broken. We do not seek to diminish these grave tragedies, and that is not what *Daniels* and *Burgos* teach us.[7] What is clear, however, is that when officer DiPasquale reacted to the situation on the night of October 1, 1998, he was acting on his perceptions, however misguided, of the public danger posed by Dawson's conduct. His actions were directed solely at the person at the center of that volatile situation—Dawson himself. Cynthia Dawson, McCurdy, and the parent-child relationships between them and their son were not on DiPasquale's mind when he pulled the trigger. Simply put, his actions were not directed at the relationships between the parents and their son in the same way that the official actions in *Troxel* and *Bailey* were. It would, therefore, stretch the concept of due process too far if we were to recognize a constitutional violation based on official actions that were not directed at the parent-child relationship.

In closing, we recognize that our attempt to clarify the contours of due process protections may raise some ambiguities of its own. In most cases, the point at which a child legally becomes an adult may be established by the presumed state age of majority. *See* 23 Pa. Cons. Stat. Ann. § 5101(b) ("Except where otherwise provided or prescribed by law, an individual 18 years of age and older shall be deemed an adult and may sue and be sued as such"). Nevertheless, adulthood is often a fact-specific inquiry heavily dependent on the unique context of each situation. For this reason, all of the states in our Circuit recognize the more fluid concept of "emancipation," as well as adulthood. *See Geiger v. Rouse*, 715 A.2d 454, 458 (Pa. Super. Ct.

---

7. The loss of a family member is almost always catastrophic to the survivors. It serves no purpose to minimize the sense of loss here. However, "even an interest of great importance may not always be entitled to constitutional protection." *Burgos*, 807 F.2d at 10. Although our decision forecloses McCurdy's action under § 1983, we note that he is not entirely without recourse. In fact, he has already recovered some of what he seeks here by way of his settlement with Cynthia Dawson.

1998) (holding that the parents of an adult daughter over eighteen years of age were responsible for her unpaid medical bills because she was "unemancipated" at the time); *Newburgh v. Arrigo*, 443 A.2d 1031, 1037-38 (N.J. 1982) ("Attainment of age 18 establishes prima facie, but not conclusive, proof of emancipation . . . Whether a child is emancipated at age 18 . . . depends upon the facts of each case") (citations omitted); *Kathleen L.H. v. Wayne E.H.*, 523 A.2d 977, 978 (Del. Fam. Ct. 1987) (holding that "[t]here is no fixed age at which a child becomes emancipated"). Because it may be impossible to make sound generalizations about typical family relationships, *see Troxel*, 530 U.S. at 63, there may be rare instances where the more flexible concept of emancipation more appropriately fits the parent-child relationship at issue.[8]

For these reasons, we hold that the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child. In the vast majority of cases, adulthood may be established by reference to the presumed state age of majority; in some (probably rare) cases, the presumption of adulthood may be rebutted by clear and convincing evidence of lack of emancipation. Having found the record utterly bare of factual evidence that would support Dawson's lack of emancipation, we hold that McCurdy has failed to satisfy the threshold requirement of asserting the violation of a recognized constitutional right. In light of our decision today, we find it unnecessary to reach the issue of preclusion based on McCurdy's settlement with Cynthia Dawson and on his acceptance of his statutory share of

---

8. For instance, the factual background in *Geiger* presents an interesting dilemma. In that case, the court heard relevant and credible evidence that the child, although over the age of eighteen, was "totally dependent upon her parents as a result of her moderately severe cerebral palsy," severe depression, and lack of means of employment. 715 A.2d at 458 (internal quotation marks and citation omitted). Although in *Geiger* the parents were attempting to disclaim any liability for their daughter's medical bills, we can conceive of situations where parents in similar circumstances would have a relationship with their adult child which is indistinguishable from a relationship with a minor child.

Dawson's estate. Accordingly, we believe it was unnecessary for the District Court to address the issue as well.[9]

## IV.

For the reasons set forth above, we affirm the judgment of the District Court.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

9. Judge Alito concurs in the judgment for essentially the reasons given by the District Court.