In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-2331

EISENCORP, INC.,

*Plaintiff-Appellant,*

*v.*

ROCKY MOUNTAIN RADAR, INC. and
MICHAEL CHURCHMAN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03 C 157—**Barbara B. Crabb**, *Chief Judge.*

ARGUED DECEMBER 3, 2004—DECIDED MARCH 1, 2005

Before FLAUM, *Chief Judge,* and EASTERBROOK and
WILLIAMS, *Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiff-appellant Eisencorp, Inc.
filed suit in diversity against defendants-appellees Rocky
Mountain Radar, Inc. ("RMR") and its president Michael
Churchman, alleging, among other things, that they
terminated the parties' dealership agreement in violation of
the Wisconsin Fair Dealership Law, Wis. Stat. § 135.03
("WFDL"). The district court granted summary judgment to
defendants, and plaintiff appeals. Because we agree with
the district court's well-reasoned decision finding
no genuine issues of material fact for trial, we affirm.

## I.  Background

In September 1999, Ryan Eisenhut founded Eisencorp, Inc. as a sole proprietorship in the business of selling various consumer goods. Eisencorp was incorporated in Wisconsin in 2001, and Eisenhut remained the sole employee and sole shareholder of the company.

RMR is a Colorado corporation which manufactures and sells radar detectors, laser detectors, and scramblers designed for use by automobile and commercial truck drivers. Churchman has been president of RMR since 1990.

Eisencorp sold RMR's products pursuant to a written "dealer agreement" between Eisencorp and RMR dated September 23, 1999. Under this agreement, Eisencorp purchased goods from RMR and then resold them to others. Eisencorp did not maintain an inventory of RMR products. Rather, it solicited orders from third-party customers and then placed orders for those products with RMR. RMR then shipped the products to Eisencorp with payment due on delivery. The dealer agreement allowed Eisencorp to advertise RMR products but specifically stated that Eisencorp was an "independent dealer and may not represent itself as Rocky Mountain Radar in any capacity." (Ex. 5.) Eisencorp made an initial investment in marketing, spending $5,450 to advertise various products, including RMR's. Some of these print advertisements included the names and pictures of RMR goods. In early 2003, Eisencorp spent an additional $1,000 to place an advertisement for one of RMR's radio scramblers in a trucking magazine.

In May 2001, Eisenhut approached Churchman to discuss a potential customer named Barjan Products, LLC, a distributor of products for commercial truck drivers. Eisencorp lacked sufficient financing to purchase and then resell products to Barjan, as it had with other customers

under the dealer agreement. RMR and Eisenhut[1] agreed orally on the following arrangement. Eisencorp would solicit orders from Barjan for RMR products and negotiate prices with Barjan directly. If RMR accepted the order at the agreed-upon price, it would ship the product directly to Barjan with an RMR invoice. Upon receiving the product, Barjan would pay RMR. Eisencorp would then receive a commission, which was originally calculated as the difference between the price Eisencorp had negotiated with Barjan and the distributor price, less returns and shipping costs.

RMR sold products to Barjan in accordance with this arrangement, and RMR issued checks payable to Eisencorp (at Eisenhut's specific request), identifying these payments as "commission." This arrangement for selling products to Barjan was never reduced to writing.

Defendants contend that this separate arrangement for sales to Barjan did not affect Eisencorp's existing relationship with RMR as provided in the earlier dealer agreement. It is undisputed that after May 2001, Eisencorp continued to buy and then resell RMR products directly to other customers pursuant to this written dealer agreement.

In early January 2002, the parties modified the agreement concerning sales to Barjan. Although they described different events leading up to this modification, it is undisputed that the parties ultimately agreed that Eisencorp would continue to solicit sales from Barjan; that RMR would sell to Barjan at a fixed distributor price of

---

[1] The parties dispute whether this arrangement was made on behalf of Eisenhut individually or Eisencorp, Inc. Because we must draw all reasonable inferences in favor of plaintiff, we will assume that Eisenhut was acting on behalf of plaintiff Eisencorp, Inc. when he made this arrangement.

$153 per unit; and that RMR would pay Eisencorp its standard 6% commission on Barjan sales.

RMR allowed plaintiff to send it returns of some of the newer products Barjan had purchased. In January 2003, however, Douglas Jones, RMR's vice president of marketing, complained to Eisenhut about his attempts to return obsolete product from Barjan by mislabeling it in the shipping documents as current product. After this complaint, Eisenhut continued to misrepresent the contents of Barjan return shipments.

On February 5, 2003, shortly after Eisenhut again sent a shipment of mislabeled returns, Jones wrote a letter addressed to Eisenhut stating: "Pursuant to the Rocky Mountain Radar Sales Representative Agreement, this letter will serve as your official 30-day notification for termination. As stated this can be without cause and is official 30 days from the date of this letter." (Def. App. at 149.) Jones called Eisenhut the same day to explain that he was terminating the sales agreement. Eisenhut testified in his deposition that Jones told him: "I'm just going to get rid of you now." (R. 25, ¶ 10.) Eisenhut apparently understood this to mean that RMR had terminated any relationships that he or Eisencorp had with RMR. After receiving this letter, neither Eisencorp nor Eisenhut did any further business with RMR.

On February 5, 2003, the same day he spoke with Jones, and again the following day, Eisenhut called RMR, attempting to reach Churchman. His phone calls were not returned. Two months later, on April 7, 2003, Churchman sent a letter to Eisencorp's attorney—apparently in response to a threatened lawsuit—attempting to clarify the parties' relationship. Churchman wrote: "At all times, the distinction was always very clear that Mr. Eisenhut had two relationships with Rocky Mountain Radar: one as sales representative and a second as a dealer." (Ex. 10.) The

letter further explained: "Mr. Eisenhut is guilty of attempted fraud and insubordination and his sales representative relationship was terminated. At all times Eisencorp, Inc. was able to order and receive product." (*Id.*)

Examining the evidence in the record, the district court concluded that two separate agreements existed between the parties: the original dealer agreement and the sales representative agreement. The court determined as a matter of law that defendants had terminated the sales representative agreement but left the dealer agreement intact. Because plaintiff did not argue that the sales representative agreement qualified as a "dealership" under the WFDL, the district court reasoned, it failed to show its entitlement to protection under the Act.

## II. Discussion

Summary judgment is appropriate if the evidence presented by the parties "show[s] that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the district court's decision, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Russell v. Harms*, No. 04-2065, slip op. at 5 (7th Cir. Feb. 2, 2005). We review the district court's grant of summary judgment de novo. *Id.*

### A. Wisconsin Fair Dealership Law

The WFDL was enacted "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships[.]" Wis. Stat. § 135.025(b); *see also Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 742 (7th Cir. 1989). The statute provides:

No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

§ 135.03. Examining the legislative history of the statute, the Wisconsin Supreme Court has found that the law:

was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "good will" as part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealership.

*Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 63 (Wis. 1981). "It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice." *Id.*

The statute requires a grantor to "provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances." § 135.04. "The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void." *Id.* The WFDL further authorizes a wrongfully terminated dealer to bring an action for damages and injunctive relief. § 135.06.

The statute defines dealership, in relevant part, as:

[a] contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the

business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

§ 135.02(3)(a).

## B. The Terminated Agreement

It is undisputed that RMR terminated an agreement with Eisencorp or Eisenhut in February 2003. The relevant question is whether that agreement was a dealership agreement protected by the WFDL. Plaintiff asserts that the district court erred in granting summary judgment because there was a genuine issue of material fact as to whether there were two separate agreements, rather than one. Plaintiff argues that the arrangement by which it sold RMR products to Barjan was not a separate sales agreement but merely a modification of the parties' existing dealer agreement. Therefore, plaintiff argues, a reasonable jury could have found that a dealership agreement protected by the WFDL was terminated in February 2003.

The district court was correct in granting summary judgment to defendants. The undisputed facts in the record reveal that the parties entered into two distinct agreements as a matter of law: the written dealer agreement signed in 1999, and the sales agreement reached orally in May 2001 and modified in the beginning of 2002. The parties had to establish an agreement concerning sales to Barjan precisely because Eisencorp's method of selling to other customers under the dealer agreement would not work with respect to Barjan. Eisencorp concedes that it lacked the financing to purchase the relatively large volume of product it intended to resell to Barjan. The parties therefore negotiated and ultimately decided upon a separate arrangement for dealing with this customer.

Plaintiff's argument that the sales agreement was merely

a modification of the earlier dealer agreement is belied by the terms of the agreements and the parties' conduct thereunder. Under the dealer agreement, Eisencorp had the right to buy and resell RMR goods, but RMR never paid Eisencorp directly. Eisencorp took physical possession of RMR product and bore the risk of the transaction. Under the Barjan sales agreement, by contrast, Eisencorp never took physical possession of RMR goods; RMR shipped Barjan's order directly to Barjan, was paid directly by Barjan, and paid plaintiff a commission. Moreover, under the sales agreement, RMR always retained authority to accept or reject any order. We therefore agree with the district court's determination that two separate agreements existed as a matter of law.

Plaintiff also contends that there is a factual dispute as to which agreement was terminated. Relying primarily on the phone conversation between Eisenhut and Jones and the fact that Churchman did not return Eisenhut's phone calls, plaintiff argues that this termination was ambiguous, and that a reasonable jury could have found that RMR effectively terminated all relationships with Eisencorp.

Several undisputed facts in the record undermine plaintiff's argument. First, the February 5 letter was directed to Eisenhut and did not refer to Eisencorp or the written dealer agreement between Eisencorp and RMR. Upon receiving this letter, Eisenhut wrote across his copy of the dealer agreement, "This is not a sales rep. agreement." (Ex. 7.) While his subjective belief is not dispositive of what actually was terminated, this evidence strongly suggests that Eisenhut understood that the dealer agreement was separate from the sales agreement, and that the February 5 letter did not terminate the dealer agreement. Finally, even if Eisenhut had been confused about precisely which agreement defendants had terminated in February, any remaining ambiguity should have been eliminated by Churchman's April 7, 2003 letter to Eisencorp's attorney,

expressly stating that Eisencorp remained free to "order and receive product" under the dealer agreement. The undisputed facts reveal, as a matter of law, that RMR terminated only the sales agreement, leaving its written dealer agreement with Eisencorp intact.

Plaintiff did not argue below that the sales agreement standing alone created a "dealership" under the WFDL and makes this argument only perfunctorily on appeal. Therefore, we need not examine whether this agreement fits within the statutory framework of the WFDL. *McGoffney v. Vigo County Div. of Family & Children*, 389 F.3d 750, 753 (7th Cir. 2004) ("the requirement that parties may raise on appeal only issues which have been presented to the district court maintains the efficiency, fairness, and integrity of the judicial system for all parties").

## III. Conclusion

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*