# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3628

ISAAC RUSS and VERA LOVE,

*Plaintiffs-Appellants*,

v.

VAN B. WATTS, PHILLIP BANAZKIEWICZ,
CITY OF CHICAGO, and ROBERT HELSON,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division
No. 01 C 4098—**Samuel Der-Yeghiayan**, *Judge.*

———————

ARGUED MAY 3, 2005—DECIDED JULY 11, 2005

———————

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

FLAUM, *Chief Judge.* This case arises out of the tragic and fatal shooting of Robert Russ, a 22-year-old student at Northwestern University, by Chicago police officer Van B. Watts. The issue before us is whether the United States Constitution, through the federal civil rights statute 42 U.S.C. § 1983, provides Russ's parents with a cause of action for the loss of the society and companionship of their son. That question leads us to revisit our decision in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), in which

we held that a parent's constitutional liberty interest in his relationship with his adult son was violated when his son was killed by police. After careful consideration, we conclude that *Bell* was wrongly decided and must be overruled.[1] We hold that the federal Constitution does not allow a parent to recover in such circumstances, and, on this basis, we affirm the district court's entry of summary judgment in favor of defendants.

## I.  Background

Although the parties vigorously dispute the events that led to the shooting of Russ, it is unnecessary to resolve these factual disputes here. Instead, we construe all facts and draw all reasonable inferences in the light most favorable to plaintiffs, the non-moving party. *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.*, 398 F.3d 962, 965 (7th Cir. 2005).

On June 5, 1999, just a few weeks before his graduation, Robert Russ was driving from the Northwestern campus in Evanston, Illinois to his mother's home in Calumet City, Illinois. At approximately 1:00 A.M., Chicago police officer Phillip Banazkiewicz attempted to pull over Russ's car. When Russ did not stop, a chase ensued, with three officers—Banazkiewicz, Watts, and Deputy Sheriff Robert Helson of the Cook County Sheriff's Department—pursuing Russ in three separate police vehicles.

The chase began as Russ was heading southbound on Lake Shore Drive. It continued onto the Stevenson

---

[1]  Because this opinion overrules a prior decision by this Court, we have circulated it among all judges of this Court in regular active service pursuant to Circuit Rule 40(e). No judge favored rehearing the case en banc. Judge Evans did not participate in the decision of whether to hear the case en banc.

Expressway (Interstate 55) and then onto the southbound lanes of the Dan Ryan Expressway (Interstate 90/94). The chase finally ended after Russ's car collided with several of the police vehicles. Once stopped, the three police officers exited their vehicles and surrounded Russ's car with their weapons drawn. Officer Watts positioned himself on the driver's side of Russ's vehicle, and Officers Banazkiewicz and Helson stood on the passenger's side. Watts broke the rear window on the driver's side and fired a single shot, striking and killing Russ.

Several months before he was killed, Russ had conceived a child with Erin Lewis. Lewis gave birth to Russ's son on September 26, 1999, over four months after Russ's death. Russ's paternity was confirmed through DNA testing after the child's birth.

A few days after Russ's death, Russ's mother, Vera Love, acting as special administrator of the estate of Robert Russ, filed an action against the City of Chicago in Cook County Circuit Court under the Illinois Wrongful Death Act. Unbeknownst to Love, on January 20, 2000, the probate division of the circuit court declared Russ's and Lewis's child, Robert Anthony Russ, Jr., sole heir to Russ's estate, and appointed Lewis as independent administrator of the estate. Lewis then moved to substitute herself as plaintiff in the wrongful death action. On February 1, 2000, the court granted Lewis's motion during a very brief interval in which Love's counsel, who had been prepared to argue against the substitution, stepped out of the courtroom. The court then entered an order substituting Lewis for Love as the plaintiff in the wrongful death action. Love immediately moved to vacate the order. Following full briefing and oral argument, the circuit court denied Love's motion to vacate the order, leaving Lewis as the plaintiff in the wrongful death action. The case went to trial in September 2003. On October 17, 2003, a jury found Watts liable for Russ's death and awarded $9.6 million in damages to Russ's estate.

Following the substitution of Lewis for Love in the state court action, Russ's parents and siblings filed separate actions in federal district court against Officers Watts, Banazkiewicz, and Helson, and the City of Chicago. Their consolidated amended complaint alleged, among other things, that defendants violated plaintiffs' due process right to associate with Russ. On defendant's motion, Judge Gettleman, the district judge to whom this case was originally assigned, dismissed several of plaintiffs' claims, including all claims brought by Russ's siblings. Plaintiffs Vera Love and Isaac Russ also voluntarily dismissed their claims against the City.

This case was reassigned to Judge Der-Yeghiayan in August 2003. After the close of discovery, Russ's parents and the defendant officers cross-moved for summary judgment on the two remaining claims: (i) violation of plaintiffs' right to associate with their son; and (ii) failure to prevent the excessive use of force. The district court granted summary judgment in favor of defendants, concluding that plaintiffs lacked standing to bring the action. Plaintiffs now appeal.

## II. Discussion

Summary judgment is appropriate if the evidence presented by the parties "show[s] that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo. *Eisencorp*, 398 F.3d at 965.

We held in *Bell* that a father whose son was killed by a Milwaukee police officer during a chase could recover under § 1983 for the violation of his substantive due process right to associate with his son. 746 F.2d at 1243-44.

On February 2, 1958, Milwaukee police officers Thomas Grady, Jr. and Louis Krause observed Daniel Bell, a 23-

year-old black man, driving a vehicle that was missing a tail-light. Grady pulled over Bell's car, and Bell jumped out of the car and ran away. *Id.* at 1215. Grady and Krause pursued Bell—first by car, and then on foot. *Id.* Grady was carrying a loaded revolver. As he caught up with Bell, Grady extended his hand to grab Bell. The gun discharged, shooting Bell in the upper back. *Id.* The defendants claimed that the shot was accidental; Bell's family members, who later sued, believed that Grady intentionally pulled the trigger. *Id.* at 1215 n.2.

After determining that Bell was dead, Grady planted a knife in Bell's right hand. He and Krause then agreed on the story they would tell about what had happened: that Bell had jumped out of the car armed with a knife and yelled: "You won't catch me, I'm a holdup man!" *Id.* at 1216. Other witnesses at the scene testified that they saw nothing in Bell's hands nor did they observe Bell swing or lunge at Grady, as the officers claimed. *Id.* at 1221-22.

After an internal investigation, the district attorney and medical examiner held an inquest into Bell's death, which returned a verdict that the killing was justifiable. *Id.* at 1222. Daniel Bell's father, Dolphus Bell, died in 1962 without recovering for the death of his son. *Id.* at 1223.

Twenty years later, in 1978, Krause revealed that he and Grady had lied about what had occurred during the Bell shooting. *Id.* On August 29, 1979, Grady pleaded guilty to homicide by reckless conduct and perjury. He was sentenced to seven years of imprisonment and was paroled after three years. *Id.*

In October 1979, Daniel Bell's sister and eleven brothers filed suit in federal court on behalf of themselves, the estate of Daniel Bell, and the estate of Dolphus Bell. *Id.* at 1224. Their complaint named as defendants Officer Grady, the City of Milwaukee, former Police Chief Johnson, and former Detective Sergeant Shaffer, and alleged various constitu-

tional violations arising out of the killing of Daniel Bell. After a ten-week trial, the jury found, among other things, that Grady violated Daniel Bell's constitutional rights by shooting and killing him, and awarded Daniel Bell's estate $100,000 in compensatory damages and $25,000 in punitive damages. *Id.* at 1225. The jury awarded the estate of Dolphus Bell $75,000 for the loss of society and companionship of Daniel Bell, plus funeral expenses, and awarded a total of $100,000 to Daniel's twelve siblings for the loss of society and companionship. The jury also found that the defendants had conspired to cover up the facts of the shooting of Daniel Bell, depriving his family of due process of law and racial equality, and awarded compensatory and punitive damages. *Id.*

The defendants raised numerous issues on appeal, challenging the constitutional and statutory underpinnings of the plaintiffs' claims. We upheld the award to Dolphus Bell's estate for the loss of society and companionship, concluding that Daniel Bell's father "possessed a constitutional liberty interest in his relationship with his son." *Id.* at 1243. In reaching this conclusion, we relied on the Supreme Court decisions "examining the parameters of the constitutional protection afforded the parent-child relationship." *Id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *May v. Anderson*, 345 U.S. 528, 533 (1953); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). We also found support in the Supreme Court decisions protecting the parental relationship from state interference. We concluded:

> The due process clause requires that severances in the parent-child relationship caused by the state occur only with rigorous protections for the individual liberty interests at stake. The state may not separate the parent from the child, even temporarily, without according them due process of law to protect their liberty interests.

*Id.* at 1243-44 (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981); *Little v. Streater*, 452 U.S. 1, 13 (1981); *Smith v. Org. of Foster Families*, 431 U.S. 816, 842, 846 (1977); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).

We held that Daniel's status as an adult living on his own at the time he was killed did not preclude recovery, stating, "we are unpersuaded that a constitutional line based solely on the age of the child should be drawn." *Id.* at 1245. We explained that "[t]he Supreme Court's decisions protect more than the custody dimension of the parent-child relationship" and that the protected relationship "includes the parent's 'interest in the companionship, care, custody, and management' of the child." *Id.* (quoting *Stanley*, 405 U.S. at 651). We also noted that Daniel Bell was single, had no children, and had not become part of another family unit. "[H]is father's family was his immediate family." *Id.* Moreover, we observed, the Wisconsin wrongful death statute permitted recovery for loss of society and companionship regardless of the age of the child at his death. *Id.* (citing Wis. Stat. § 895.04(4)). We therefore concluded that Daniel's age and separate residence were matters for the jury to consider when determining damages, but were not a bar to recovery. *Id.*

Our opinion declined to extend constitutional protection to the relationship between Bell and his siblings, remarking that were we to rule otherwise, "there could be no principled way of limiting such a holding to the immediate family or perhaps even to blood relationships." *Id.* at 1247. We noted that Supreme Court decisions examining the Fourteenth Amendment liberty interests were based primarily on the parents' constitutional right to raise, associate with, and make decisions affecting the family, even though they also alluded to the importance of the integrity of the family unit as a whole. *Id.* at 1245-46.

In support of their motion for summary judgment before the district court, defendants argued that Russ's parents

lacked standing because Russ had formed a new family unit with Lewis. Based on our statement in *Bell* that Daniel's "father's family was his immediate family," the district court concluded that the crucial issue in determining whether Russ's parents had standing to recover for the loss of society and companionship of their son was whether Russ had become part of another family unit.

To answer this question, the district court relied on the following facts admitted by plaintiffs: (i) at the time of his death, Russ lived on campus at Northwestern; (ii) when Erin Lewis learned she was pregnant with Russ's child, they discussed the pregnancy; and (iii) before his death, Russ was making plans to care for his unborn son. In addition, the district court relied on defendants' allegation that Russ and Lewis had discussed moving in together to raise their son. Although plaintiffs disputed this fact, the district court concluded that they had failed to provide any citations in the record to support their denial.

The district court thus concluded: "It is clear from the facts and the totality of the circumstances before us that Russ was no longer living at home at the time of his death and that he had formed a new family unit." *Russ v. Watts*, 2004 WL 1459262, at *4 (N.D. Ill. June 18, 2004). Based on this conclusion, the district court held that "Russ' parents have not shown that they have standing to proceed in this suit" and granted summary judgment in favor of all remaining defendants. *Id.*[2]

---

[2] Because, as explained below, our holding rests on a different basis, we need not decide whether the record supports the district court's conclusion. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 332 (7th Cir. 2002) ("An appellate court may affirm the district court's decision on any ground supported by the Record, even if different from the grounds relied upon by the district court.").

Since *Bell*, several of our sister circuits have considered whether the Constitution protects a parent's relationship with his adult children in the context of state action which has the incidental effect of severing that relationship. No other court of which we are aware has allowed a parent to recover for the loss of his relationship with his child in these circumstances. Most courts that have considered the issue have expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship. *See Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985) (plaintiffs' § 1983 action for the wrongful death of their son and brother while he was in state custody was properly dismissed because plaintiffs did not allege that defendants intended to deprive them of their protected relationship with the decedent); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 9 (1st Cir. 1986) (declining to find violation of substantive due process right based on government action causing only an "incidental deprivation" of the relationship between appellants and their adult relative when he was allegedly beaten to death by guards while in prison); *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003) (where officer shot and killed individual after he refused demands to hold up his hands, father could not recover for deprivation of his relationship with his son because the official action was not "directed at the parent-child relationship"); *see also Claybrook v. Birchwell*, 199 F.3d 350, 357-58 (6th Cir. 2000) (adult children whose father was shot by police officers could bring action under § 1983 only as administrators of father's estate, not for any collateral injuries suffered by themselves personally); *Shaw v. Stroud*, 13 F.3d 791, 804-05 (4th Cir. 1994) (declining to recognize wife and minor child's Fourteenth Amendment claim for loss of love and support of their husband and father after he was shot by police officer). *But see Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985) (parents had a constitutionally protected liberty interest in the companionship and society

of their 14-year-old son and stated claim under § 1983
against school officials after their son committed suicide
while at school).

Courts have also been reluctant to extend the constitu-
tional protections afforded the parent-child relationship to
cases involving adult children. *See Valdivieso Ortiz*, 807
F.2d at 8 (noting that decedent was over 21 at the time of
his death and was "not a minor child still within 'the care,
custody, and management' of his parents"); *Butera v.
District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001)
(holding that a "parent does not have a constitutionally-
protected liberty interest in the companionship of a child
who is past minority and independent"); *McCurdy*, 352 F.3d
at 829 (parental liberty interest as defined by the Supreme
Court "must cease to exist at the point at which a child
begins to assume that critical decisionmaking responsibility
for himself or herself").

An analysis of the decisions of our sister circuits as well
as a reexamination of our own rationale in *Bell* convinces us
that *Bell* was wrongly decided. We do not make such a
declaration lightly. Although we must give considerable
weight to our prior decisions, we are not bound by them
absolutely and may overturn Circuit precedent for compel-
ling reasons. *In re Bentz Metal Prods. Co.*, 231 F.3d 1029,
1033 (7th Cir. 2000). Other circuits' rejection of our position
provides one such compelling reason. As we have previously
explained:

> When a number of other circuits reject a position that
> we have taken, and no other circuit accepts it, the in-
> terest in avoiding unnecessary intercircuit conflicts
> comes into play; and if we are asked to reexamine our
> position, we can hardly refuse. That is not to say that
> reexamination will cause us to relinquish the posi-
> tion. . . . But if upon conscientious reexamination we
> are persuaded that the other circuits have the better of

the argument, we should abandon our position in order to spare the Supreme Court extra work.

*United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995) (internal citations omitted).

That *Bell* stands alone causes us to reconsider its holding. We now see that our conclusion that Dolphus Bell's parental liberty interest was violated by the killing of his son was not well grounded in the Constitution or Supreme Court case law. The Supreme Court has recognized violations of the due process liberty interest in the parent-child relationship only where the state took action specifically aimed at interfering with that relationship. As the Supreme Court has explained, "[h]istorically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (collecting cases).

The Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted). The Court has cautioned that we must "exercise the utmost care" in extending constitutional protection to an asserted right or liberty interest because, in doing so, we "place the matter outside the arena of public debate and legislative action." *Id.* With these principles in mind, we turn to the liberty interest asserted by plaintiffs.

Although it is well established that parents have a fundamental constitutional liberty interest in the "care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65 (2000), the appropriate framework for analyzing claims alleging a violation of this interest is less than clear. *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003);

*Galdikas v. Fagan*, 342 F.3d 684, 689-90 (7th Cir. 2003), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). In *Glucksberg*, the Supreme Court articulated a two-part analysis for substantive due process claims:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.

521 U.S. at 720-21 (internal citations omitted). The Court suggested that a strict scrutiny test applies, stating that "the Fourteenth Amendment 'forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Id.* at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The following term, in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Court suggested that the analytical framework differs depending on whether the government action at issue is legislation or a specific act of a governmental officer. *Id.* at 846. Observing that the Due Process Clause was "intended to prevent government officials from abusing their power, or employing it as an instrument of oppression," the Court determined that the appropriate test with respect to executive action is whether the executive has abused its power in a way that "shocks the conscience." *Id.* at 846-47. The interrelationship between *Glucksberg* and *Lewis* has been a source of considerable confusion. *See Galdikas*, 342 F.3d at 690 n.3. Further complicating matters, in *Troxel*, a plurality of the Court used a "combination of factors" test to hold that a state's visitation statute,

as applied, unconstitutionally infringed on parents' fundamental right to rear their children. 530 U.S. at 72-73; *Heck*, 327 F.3d at 519.

In deciding this case, we need not resolve the issue of precisely what level of scrutiny should apply to allegations of government interference with the parental liberty interest. Under any standard, finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court. *See McCurdy*, 352 F.3d at 830; *Valdivieso Ortiz*, 807 F.2d at 9.

Our finding of a constitutional violation in *Bell* was not appropriately moored to Supreme Court precedents establishing the contours of the parental liberty interest. The decisions on which we relied as "indicat[ing] that Daniel Bell's father possessed a constitutional liberty interest in his relationship with his son" all dealt with the right to procreate and make decisions about rearing one's minor children without state inference. *See Meyer*, 262 U.S. at 400 (right of parents to engage teacher to instruct child in foreign language); *Skinner*, 316 U.S. at 541 (state-imposed sterilization "forever deprives" individual of a "basic liberty"); *Prince*, 321 U.S. at 165-66 (parental right to give children religious training and encourage them in practice of religious beliefs); *May*, 345 U.S. at 534 (mother's right to custody and "immediate possession" of her minor children). These precedents certainly did not compel the result we reached in *Bell*.

Similarly, all the cases we cited in *Bell* for the proposition that the state may interfere with the parental relationship only after providing sufficient procedural protection involved state action that purposefully interfered with the family relationship. *See Lassiter*, 452 U.S. at 31 (addressing due process requirements in parental termination proceedings); *Little*, 452 U.S. at 16-17 (due process obligates state to aid putative

father in obtaining blood test in paternity proceeding where state is adversary); *Smith*, 431 U.S. at 854-56 (examining constitutional adequacy of notice, pre-removal conference, and post-removal hearing in administrative action to remove child from custody of foster parents); *Stanley*, 405 U.S. at 649 (due process entitles unwed father to a hearing on his fitness as a parent before removing minor children from his custody); *see also Caban v. Mohammed*, 441 U.S. 380, 394 (1979) (state law allowing adoption of minor children born out of wedlock without consent of father who has "manifested a significant paternal interest in the child[ren]" violated equal protection); *Quilloin v. Walcott*, 434 U.S. 246, 254-55 (1978) (adoption of illegitimate minor child despite objection of natural father who had no ongoing relationship with child did not violate equal protection or substantive due process).

Neither *Bell* nor the instant case involved intentional action by the state to interfere with a familial relationship; plaintiffs in this case have not alleged that Watts shot Russ for the specific purpose of terminating Russ's relationship with his family. Affording plaintiffs a constitutional due process right to recover against the state in these circumstances would create the risk of constitutionalizing all torts against individuals who happen to have families. Upon reconsideration, we now recognize that the finding of a violation of the parental liberty interest in *Bell* is no longer supportable. Furthermore, although we need not impose an absolute rule that parents of adult children lack any liberty interest in their relationship with their children, we agree with our sister circuits that minor children's need for the guidance and support of their parents warrants "sharply different constitutional treatment." *Butera*, 235 F.3d at 656; *McCurdy*, 352 F.3d at 829.

We therefore overrule our decision in *Bell* insofar as it recognized a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action. Having

concluded that Russ's parents have no constitutional right to recover for the loss of society and companionship of Russ in these circumstances, we need not address the other issues raised by the parties.

## III. Conclusion

For the foregoing reasons, we affirm the entry of summary judgment in favor of defendants.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*