COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| In the matter of the Guardianship of: | ) ) ) | No.   30985-1-III |
| KENYON CORNELIUS | ) ) | ORDER GRANTING MOTION |
| An Incapacitated Person. | ) ) ) | TO PUBLISH OPINION |

THE COURT has considered the third party motion to publish the court's opinion

of April 17, 2014, and the record and file herein, and is of the opinion the motion should

be granted.  Therefore,

IT IS ORDERED, the motion to publish is granted.  The opinion filed by the court

on April 17, 2014 shall be modified on page 1 to designate it is a published opinion and

on page 26 by deletion of the following language:

> A majority of the panel has determined that this opinion will not be
> printed in the Washington Appellate Reports but it will be filed for public
> record pursuant to RCW 2.06.040.

DATED:  June 10, 2014.

PANEL:  Judges Siddoway, Brown, Korsmo.

FOR THE COURT:

_____
LAUREL H. SIDDOWAY, Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the matter of the Guardianship of: | ) | |
| | ) | No. 30985-1-III |
| | ) | |
| KENYON CORNELIUS, | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| An Incapacitated Person. | ) | |

SIDDOWAY, C.J. — Christina Baldwin appeals the trial court's order appointing

Leslie Cloaninger as full guardian of Ms. Baldwin's daughter, Kenyon Cornelius, a

developmentally delayed adult. Although Ms. Baldwin had earlier served as a co-

guardian of her daughter's person and estate, neither that earlier role, nor the parent-child

relationship, gives rise to the constitutional interest or procedural rights that she claims

should have been recognized in the trial court. We find no error and affirm the trial

court's order.

FACTS AND PROCEDURAL BACKGROUND

Kenyon Cornelius, presently age 43, has Down's Syndrome and suffers from a

frontal lobe brain injury sustained in a bicycle accident as an adult. As a result of her

moderate developmental delay, she needs protection and assistance in providing informed

consent for medical decisions, in making personal decisions, and in managing her

property and financial affairs. Her parents, Christina Baldwin and Scott Cornelius, were appointed as co-guardians of her person shortly before Ms. Cornelius turned 18.

In March 2010, the Washington State Department of Social and Health Services, acting upon a report from its Adult Protective Services, petitioned the Whitman County Superior Court to appoint a guardian ad litem to review Ms. Cornelius's guardianship based on concerns about Ms. Cornelius's relationship with her mother. The court appointed Jill Wahl as guardian ad litem and appointed a lawyer for Ms. Cornelius. In May, Ms. Baldwin filed a response to the State's petition, denying any problems and making clear that she wished to continue to serve as her daughter's guardian.

In late May and early June, Ms. Wahl filed her report and noted the State's petition for hearing on June 18. Her report, which was based on interviews and extensive investigation, concluded that the current situation with the parents serving as co-guardians was detrimental to Ms. Cornelius. She reported that Ms. Cornelius loves her mother but wanted her removed as co-guardian. According to Ms. Cornelius, she had lost caregivers with whom she was satisfied when they were either fired, or driven to quit, by her mother. While Ms. Wahl recognized that Ms. Baldwin loved her daughter and acted out of concern, she reported that Ms. Baldwin's approach was disruptive. There was consensus that Ms. Cornelius and her mother had conflicts; even Ms. Baldwin admitted problems in their relationship, but she attributed them to service providers "badmouthing" her when Ms. Baldwin refused to tolerate unsatisfactory performance of

services by her daughter's providers. Report of Proceedings (RP) at 140. Ms. Wahl ultimately did not accept that explanation because the common denominator in the conflict scenarios was Ms. Baldwin; she concluded that Ms. Baldwin was the problem. Ms. Wahl also reported that Ms. Baldwin was over-involved. By way of example, Ms. Baldwin had provided her and other service providers with so much information and so many requests for participation and input that because the providers' time was limited, the result was time taken away from clients and a lower level of service

Ms. Wahl recommended that a professional third party serve as guardian while allowing Ms. Baldwin and Mr. Cornelius to be as involved in Ms. Cornelius's life as much as appropriate, writing that the mother "'has relevant information to share and plays an important role in Kenyon's life,'" and that "'Kenyon deserves to have parents who are able to act just as parents.'" Br. of Appellant at 3.

The court granted Ms. Wahl's request for temporary appointment of a professional guardian. Its decision and order suspended the authority of Ms. Baldwin and Mr. Cornelius as guardians of Ms. Cornelius's person[1] and appointed Ms. Cloaninger as temporary interim guardian, finding that "[s]ubstantial evidence has been presented that leads the court to believe that Tina Baldwin's service as guardian of the person of

---

[1] The court held and later continued to hold that Ms. Baldwin and Mr. Cornelius would serve as guardians of the estate. Only the guardianship of Ms. Cornelius's person is at issue.

Kenyon Cornelius, while being carried out diligently and in good faith, is having a severe adverse impact on Kenyon's physical, emotional, and psychological well-being." Clerk's Papers (CP) at 252-53. It set a final hearing on the State's petition for September 29 and 30, 2010.

Following the court's order, the State agreed to mediate with Ms. Baldwin over how she might resolve the State's concerns and be reinstated as a guardian. Shortly before the date for the final hearing, the State moved for a continuance, reporting that the parties had been trying to settle the matter, so far without success, and requested a "short continuance, not to exceed 6 months . . . in order to continue working on a potential settlement, or to allow time for the parties to adequately prepare for a contested trial." CP at 258. The trial court granted the motion and continued the date for the final hearing to January 26 and 27, 2011.

On January 26, the parties appeared for what the trial court anticipated would be the final hearing. They reported instead that the petition had been settled. The State, Ms. Baldwin, Mr. Cornelius, Ms. Cloaninger, Ms. Wahl, and the attorney for Ms. Cornelius had executed a "Memorandum of Agreement" that they filed with the court at that time— by then, a year after the State had filed its petition.

The settlement agreement provided that an agreed order would be entered naming Ms. Cloaninger as the guardian of Ms. Cornelius's person but that the parents could be reinstated as co-guardians if, by May 2011, Ms. Baldwin (1) demonstrated an ability to

4

work cooperatively with agencies and professionals and (2) submitted to a psychological evaluation and demonstrated follow-through with the psychologist's recommendations. The agreement provided that whether the conditions for reinstatement had been met would be "determined by a judicial officer through a hearing in consultation with a [guardian ad litem]." CP at 267. The guardian ad litem for this purpose would be "a new neutral . . . as agreed by the parties." CP at 268. In the event conditions for reinstatement of the parents as co-guardians were not met, Ms. Cloaninger would continue to serve and any further changes to the guardianship would have to meet the statutorily defined cause for replacement.

Consistent with the settlement, the court entered an "Order Appointing Substitute Guardian of Person," finding that Ms. Baldwin and Mr. Cornelius had "resigned as agreed to pursuant to the mediation agreement filed with this court." CP at 269. It issued letters of full guardian of the person to Ms. Cloaninger.

The May 2011 deadline for Ms. Baldwin to complete the conditions for reinstatement came and went. It was almost a year after Ms. Cloaninger's appointment as full guardian and almost two years after the State's petition was filed that the State moved for the appointment of James Woodard to serve as a neutral guardian ad litem to assist the court in determining whether Ms. Baldwin and Mr. Cornelius could be reinstated as guardians of the person. By Mr. Woodard's own admission, he became involved after the time frame within which the conditions to Ms. Baldwin's and Mr.

5

Cornelius's reinstatement were to take place had passed. He described himself as having been appointed to make a recommendation by agreement of the parties. The State presented and the trial court signed an ex parte order appointing Mr. Woodard. CP at 307.

On January 27, 2012, Ms. Cloaninger filed a statutorily required initial personal care plan for Ms. Cornelius. By that time, the relationship between Ms. Cloaninger and Ms. Baldwin had become increasingly adversarial. Ms. Cloaninger told Ms. Baldwin to have no contact with Kenyon until the court rules otherwise, warning that she would seek a restraining order if Ms. Baldwin did. Ms. Cloaninger's care plan made reference to this problem and incorporated her proposal that Ms. Baldwin's "time and contact with Kenyon be limited." CP at 342.

Ms. Cloaninger's care plan was set by the court for an April 10 hearing. In proceedings taking place before that, on March 23, Ms. Cloaninger reported to the trial court that Mr. Woodard expected to file his recommendation before the April 10 hearing on the care plan and she believed his report would be a critical piece of information in reviewing the care plan. The trial court agreed and asked that the parties pass along to Mr. Woodard the court's desire to see his report before the April 10 hearing.

Ms. Cloaninger also made clear during the March 23 proceedings that she would like to see any issue of Ms. Baldwin's possible reinstatement resolved at the April 10 hearing. She expressed her view that the settlement agreement, to which she was a party,

6

"doesn't even apply any longer. The time deadlines that were contemplated in [the] agreement have long since passed." RP at 49. Ms. Baldwin's lawyer disagreed and expressed concern that she and the State might not have time to be prepared for "a full-blown hearing on the guardianship, in quotations, by the 10th." RP at 64. The trial court responded that it did not have a motion to continue pending and, "I'll hear all this argument only if that does become an issue." RP at 65.

On April 3, Mr. Woodard filed his report. He concluded that while Ms. Baldwin had undergone the required psychological evaluation, she did not demonstrate the capacity or the ability to work with providers as required by the agreement. He reported that Mr. Cornelius no longer wished to return to the position of co-guardian. He recommended that Ms. Cloaninger remain as guardian.

On April 9, Ms. Baldwin filed a response and objections to the proposed care plan. She focused in particular on "the issue embedded in the proposed care plan, namely, that of limiting Ms. Baldwin's contact as Mother with her daughter, Kenyon." CP at 396. Among other arguments, Ms. Baldwin contended that the settlement agreement remained in effect and required the guardian to "'encourage a mother daughter relationship between Christina and Kenyon.'" *Id.*

Ms. Baldwin's objections thereby directly raised the issues of whether her contact with Ms. Cornelius should be limited and whether the settlement agreement was still in effect. At the same time, however, Ms. Baldwin tried to defer any final decision on her

reinstatement, arguing "we do not yet arrive at the . . . final determination under the *Agreement* as to whether or not Mr. Cornelius and Ms. Baldwin will be reappointed as guardians" because, she contended, the agreement required that the parents receive Mr. Woodard's report 15 days before a hearing and she had only received it a week before. CP at 397.

At the next day's hearing, Ms. Cloaninger, Mr. Woodard, Ms. Baldwin, and Mr. Cornelius testified. Ms. Cornelius was not present, but was represented by her lawyer. Toward the end of the hearing, Mr. Woodard stated that the court should appoint Ms. Cloaninger as guardian on a permanent basis "rather than having to go through another one of these hearings." RP at 209. In his earlier testimony Mr. Woodard had been critical of the parties' settlement agreement because of its focus on whether someone was "entitled to be a co-guardian" rather than on what was best for Ms. Cornelius. RP at 97. The trial court, receptive to this view, orally ruled at the conclusion of the hearing that the parties' agreement was of no further effect, explaining,

> This memorandum of agreement that I heard about over and over again that was about the parents. That was about attempts to reinstate the co-guardians. I'm tired of hearing about it. It was a good faith attempt. It failed. And it's not in Kenyon's best interest and this case is about Kenyon. So from this point on I don't—I'm not going to give any effect to that as far as this guardianship is concerned.

RP at 217-18. The court ruled that Ms. Cloaninger's appointment as full guardian of the person would continue and that she would be given "great latitude in handling the issues of restricting or limiting Ms. Baldwin's contact with Kenyon." RP at 219.

On June 15, the court entered a written order memorializing its rulings and noting that it had, "on its own motion, considered the issue of [the mother] being reappointed, as more than 8 months had passed, and it was in Kenyon Cornelius's best interest to settle the matter who would be Guardian of her Person." CP at 445. Ms. Baldwin appeals.

## ANALYSIS

Before turning to Ms. Baldwin's specific assignments of error, we address the posture of the case at the time of the June 15, 2012 order that is challenged on appeal.

Superior courts are authorized to appoint guardians for the persons and estates of incapacitated persons upon determining that the individual is at a significant risk of personal or financial harm as a result of incapacities provided by statute. RCW 11.88.010(1). The guardianship act, chapter 11.88 RCW, sets forth the procedure for establishing guardianships and limited guardianships for incapacitated persons. *In re Marriage of Blakely*, 111 Wn. App. 351, 357, 44 P.3d 924 (2002). The act does not treat parents or other family members as having a right to serve as guardian or as receiving special consideration for appointment as guardian. *See* RCW 11.88.020 (entitled "Qualifications"). Once appointed, a guardian is at all times under the general direction and control of the court making the appointment. RCW 11.92.010. "'The court having

9

jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court.'" *In re Guardianship of Lamb*, 173 Wn.2d 173, 190, 265 P.3d 876 (2011) (quoting *Seattle-First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977)).

RCW 11.88.030 and .040 dictate the procedures to be followed in petitioning for a determination of incapacity and the initial appointment of a guardian. They, or their predecessor provisions, would have applied to Ms. Cornelius's guardianship when it was first established in 1989. They do not apply to the State's petition filed in 2010.

The procedure followed for hearing the State's petition for substitution or clarification is provided instead by RCW 11.88.120, which contains the few statutory requirements that must be followed to modify a guardianship, including by replacing the guardian. "Any person" may apply to the court for an order to replace a guardian. RCW 11.88.120(2). The court is authorized "for . . . good reason" to replace the guardian "[a]t any time." RCW 11.88.120(1). Elsewhere, the act provides that in a hearing on an application to replace a guardian, "the court may grant such relief as it deems just and in the best interest of the incapacitated person." RCW 11.88.120(4).

If the applicant for modification of a guardianship is an unrepresented person, RCW 11.88.120(3) includes special provisions for notice and hearing that contemplate extensive involvement by the court clerk. Where an applicant is represented by counsel, as the State was here, the clerk is not involved in providing notice. The State does not

dispute that Ms. Baldwin was entitled to notice and the opportunity to participate in the hearing on its petition.

The State's petition for substitution or clarification was noted for a hearing before the Whitman County Superior Court to take place on June 18, 2010. At that time, Ms. Baldwin's and Mr. Cornelius's service as guardians was suspended, Ms. Cloaninger was appointed temporary guardian of the person, and the final hearing on the petition was scheduled for September 29 and 30. At the request of the parties, including Ms. Baldwin, the date for final hearing was continued to January 26 and 27, 2011. On the January 26 date of the final hearing the parties appeared, filed their settlement agreement, and the court entered its order resolving the State's petition, recognizing the resignations of Ms. Baldwin and Mr. Cornelius, and issuing letters of full guardianship of the person to Ms. Cloaninger.

As of April 10, 2012, there was no need for any further hearing on the State's petition; it had been resolved by the parties' settlement. What remained was approval of Ms. Cloaninger's care plan. There was also a looming dispute over whether the settlement agreement had any continuing effect. No one had filed a motion to enforce it, but Ms. Baldwin had raised the issue of its continuing viability as an objection to Ms. Cloaninger's proposed care plan.

With that posture in mind, we turn to Ms. Baldwin's specific assignments of error. We first address her contention that the trial court erred in ruling that the settlement

11

agreement was of no further effect. We then address, in turn, her remaining contentions

that (1) she was denied procedural due process and the notice required by RCW

11.88.040, (2) the court erred in determining to appoint Ms. Cloaninger without affording

more time for interested parties to respond to a report by a guardian ad litem, and (3) the

decision to appoint Ms. Cloaninger and give her "great latitude" to limit contact between

Ms. Baldwin and her daughter was not supported by the evidence.

I. *Ruling "Sua Sponte" That Settlement Terms Were "No Longer in Effect"*

Ms. Baldwin argues that the trial court erred in ruling, sua sponte, that the

memorandum of agreement was "no longer in effect." Br. of Appellant at 1.[2] She points

to a provision of the agreement providing that the guardian "shall encourage a mother

daughter relationship between Christina and Kenyon," which, she argues, cannot be read

to have a termination date. CP at 266. She also argues that the trial court should have

---

[2] Ms. Baldwin did not assign error to the trial court's finding 1.7 that "[t]he Memorandum of Agreement dated September 1, 2010 is no longer in effect," or for that matter, to its finding 1.1 that "[a]ll notices required by law have been given and proof of service as required by statute is on file," or its finding 1.4 that "[t]he proposed Certified Professional Guardian, LESLIE CLOANINGER, is qualified to act." CP at 446-47. They would ordinarily be treated as verities on appeal. *See In re Interest of Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002). RAP 10.3 requires an appellant to assign error to the findings of fact challenged. *Delagrave v. Emp't Sec. Dep't*, 127 Wn. App. 596, 607, 111 P.3d 879 (2005). We will overlook this failure to comply with the appellate rules in the spirit of liberally promoting justice and facilitating the decision of cases on the merits because the nature of the appeal on this issue is sufficiently clear from argument in the body of the brief. RAP 1.2(a); *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995).

heard evidence as to whether the May 1, 2011 deadline for the parents to satisfy the conditions for reinstatement as guardians had been extended.

Mediated resolutions of guardianship disputes are contemplated by the guardianship act. It provides at RCW 11.88.090(2) that the court may require and establish terms of mediation whenever it appears that the incapacitated person or her estate "could benefit from mediation and such mediation would likely result in overall reduced costs to the estate." Here, mediation was not court ordered, it was initiated by the parties. But the trial court did incorporate the parties' agreement in part in its order appointing substitute guardian of person, by appointing Ms. Cloaninger with "other duties [and] responsibilities as outlined in the 'Memorandum of Agreement' filed separately" and by providing that the guardianship would continue in effect until terminated pursuant to Title 11 RCW "or as modified as agreed to pursuant to the mediation agreement." CP at 270-71.

Ms. Baldwin argues that by deciding sua sponte that the agreement was of no further effect, the trial court denied her an opportunity to advance law and argument in support of her position as to the meaning and continuing viability of the agreement. As the State points out, Ms. Baldwin provides no argument, citations to legal authority, or reference to the record in support of a construction of the agreement different from the view of the trial court. *See* RAP 10.3(a)(6).

13

This was not some private dispute between the State and Ms. Baldwin in which the trial court was merely acting as referee. As earlier noted, the trial court acts as the superior guardian to the ward and is charged with making appointments that are "just and in the best interest of the incapacitated person." RCW 11.88.120(4). The guardianship statute provides that in determining the disposition of a petition for guardianship, the court's order shall be based upon its findings as to the incapacitated person's capacities, condition, and needs, "and shall not be based solely upon agreements made by the parties." RCW 11.88.095(1).

Washington cases provide that "[w]hen a court order incorporates an agreement between the parties, the 'meaning of the order is the same as the meaning objectively manifested by the parties at the time they formed the agreement.'" *Martinez v. Kitsap Pub. Servs., Inc.*, 94 Wn. App. 935, 942, 974 P.2d 1261 (1999) (quoting *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn. App 650, 654, 953 P.2d 812 (1998)). Here, it was the terms objectively manifested by the parties at the time they presented the settlement agreement to the trial court that it found acceptable and consistent with Ms. Cornelius's best interest.

At the time the court found the agreement acceptable and incorporated portions into its order, the State's petition had been pending for a year. The agreement required the parents to satisfy the conditions for reinstatement within the next 4 months (although the agreement referred to an 8-month period, it stated that "the 8 month provision . . .

14

began to run on September 1, 2010"). CP at 268. The objectively manifested intent of the parties was that at or before the May deadline, "the guardianship may return to a co-guardian situation with [Ms. Baldwin and Mr. Cornelius] as co-guardians *provided* the [provisions identified in section 7 of the agreement] are met." CP at 267. If the deadline were not met, the agreement provided:

> If after 8 months the provisions of [section 7] have not been met the professional guardian shall remain in place. The guardian may then carry out her guardianship duties as she believes fit and in keeping with what she determines to be in Kenyon's best interests. Any further attempt to change the guardian must meet the statutorily defined cause for replacement.

CP at 268.

By accepting and incorporating this short-term possibility of reinstatement of the parents as guardians, the trial court was not bound by whatever delays or modifications Ms. Baldwin might thereafter request and the State might thereafter find tolerable. It is noteworthy that both guardians ad litem objected to the seemingly open-ended prospect of the parents' reinstatement. Both urged the trial court to make clear that the short-term reinstatement possibility provided by the agreement had passed.

It was consistent with the objective meaning of the settlement agreement *as incorporated by the court's order* for the trial court to rule that the reinstatement option

15

and related directives to Ms. Cloaninger were of no further effect. It was appropriate for the court, sua sponte, to make that meaning of its order clear to the parties.[3]

## II. *Alleged Violation of Due Process and Rights Under RCW 11.88.040*

Ms. Baldwin next contends that when the trial court entered what she characterizes as "a final order on a petition for guardianship" without first providing Ms. Baldwin notice and opportunity to be heard, it violated her constitutional right to procedural due process and her procedural rights under RCW 11.88.040. Appellant's Br. at 1. Constitutional challenges are reviewed de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). The management of a guardianship by the superior court is reviewed for abuse of discretion. RCW 11.92.010; *In re Guardianship of Johnson*, 112 Wn. App. 384, 387-88, 48 P.3d 1029 (2002).

Ms. Baldwin's argument that her statutory right to notice under RCW 11.88.040 was violated is readily addressed. First, RCW 11.88.040 relates to notice of a hearing before first appointing a guardian, something that happened in Ms. Cornelius's case in 1989. Second, even if RCW 11.88.040 could be said to apply at all to the proceedings initiated by the State's March 2010 petition, then it applied to the appointment of Ms. Cloaninger as full guardian on January 26, 2011, coincident with Ms. Baldwin's and Mr.

---

[3] This is not to say that the State could not reach agreement with Ms. Baldwin that it would not oppose her request for reinstatement on different terms or at a later time than provided by the original agreement. But the State and Ms. Baldwin could not foist their modifications on the court.

Cornelius's resignations. Ms. Baldwin received three weeks' notice of the initial, June 2010 hearing. The scheduling of continued hearings for September and, later, January, was announced by the court in open court, with Ms. Baldwin, her lawyer, or both present. Moreover, Ms. Baldwin's lawyer approved the order substituting guardian as to form and content, and waived presentment. Any right to greater or different notice was thereby waived.

The statute can have no conceivable application to the April 10, 2012 hearing on the care plan because Ms. Cloaninger had been appointed full guardian of the person 15 months earlier. Ms. Baldwin does not deny receiving timely notice of the April 10 date for the hearing on Ms. Cloaninger's proposed care plan.[4] She appeared and participated.

In her reply brief, Ms. Baldwin substitutes reliance on RCW 11.88.120(3) as a basis for her claim that her statutory procedural rights were violated. That provision imposes special statutory requirements involving the clerk only if an unrepresented party is the applicant and applies only to motions to modify or terminate a guardianship, neither of which the trial court did as a result of the April 10 hearing.

---

[4] The record includes Ms. Cloaninger's January 27, 2012 motion for a hearing date on her proposed care plan and a report of proceedings taking place on March 23 in which the court and the parties' lawyers discussed the impending April 10 date for the hearing. We presume the court sent out a scheduling notice of the April 10 date sometime before March 23 but it is not in our record.

17

Turning to Ms. Baldwin's constitutional due process claim, the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that no State shall deprive any person of life, liberty, or property without due process of law. "The due process clause of the Fourteenth Amendment confers both procedural and substantive protections." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 216, 143 P.3d 571 (2006). For due process protections to be implicated, there must be an individual interest asserted that is encompassed within the protection of life, liberty, or property. *Attorney Gen.'s Office, Pub. Counsel Section v. Utils. & Transp. Comm'n*, 128 Wn. App. 818, 831, 116 P.3d 1064 (2005).

For a party that has a liberty or property interest, due process requires, at a minimum, notice and an opportunity to be heard. *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 768, 871 P.2d 1050 (1994). Notice must be reasonably calculated to inform the affected party of the pending action and of the opportunity to object. *State v. Dolson*, 138 Wn.2d 773, 777, 982 P.2d 100 (1999). The opportunity to be heard must be meaningful in time and manner. *Morrison v. Dep't of Labor & Indus.*, 168 Wn. App. 269, 273, 277 P.3d 675 (2012).

Ms. Baldwin's opening brief did not identify the constitutional interest on which she relied. In response to the State's argument that she had no such interest, she asserted in her reply that parents have a "constitutional interest in maintaining a relationship with their children" and to "the companionship and society" of their children. Reply Br. of

18

Appellant at 14-15. She concedes that decisions of the United States Supreme Court "focus on the relationship between a parent and her *minor* children." *Id.* More accurately, decisions of the Supreme Court "all [deal] with the right to procreate and make decisions about rearing one's minor children without state interference." *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) (citing Supreme Court decisions and overruling *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) a case relied upon by Ms. Baldwin). Washington decisions are explicit that a parent's constitutional interest is limited to minor children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007) ("Parents have a fundamental liberty interest in the care and welfare of their minor children."); *see also Bay v. Jensen*, 147 Wn. App. 641, 656, 196 P.3d 753 (2008); *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *In re Welfare of Myricks*, 85 Wn.2d 252, 253-54, 533 P.2d 841 (1975).

Ms. Baldwin urges us to recognize a parent's liberty interest extending into a child's adulthood and cites five federal decisions for the proposition that "preservation of a relationship between a parent and her *adult* children is a constitutionally protected interest." Reply Br. of Appellant at 15. Only one of the decisions that she cites supports that proposition and that decision, *Bell v. City of Milwaukee*, which recognized an interest supporting a parent's suit for wrongful death of an adult child under 42 U.S.C. § 1983,

was overruled on this very point by *Russ*.[5] As *Russ* observes after surveying decisions of the federal courts, "Courts have . . . been reluctant to extend the constitutional protections afforded the parent-child relationship to cases involving adult children." 414 F.3d at 788.

The few courts that have recognized a parental liberty interest when it comes to adult children have found it to be an interest in *companionship*, not a right to raise or engage in decision making for the child. So even those few cases would not support a parent's claim that she was entitled to serve as her child's guardian, or to special consideration in that connection.

When it comes to the trial court's only interference with companionship—its order authorizing Ms. Cloaninger to limit Ms. Baldwin's time and contact with her daughter—Ms. Baldwin was clearly afforded due process. Ms. Cloaninger's proposed care plan, filed on January 27, 2012 and served on Ms. Baldwin at that time, stated, "Kenyon has an

---

[5] None of the four other cases cited by Ms. Baldwin includes any discussion of whether a parent's liberty interest continues after a child reaches adulthood. *P.O.P.S. v. Gardner*, 998 F.2d 764, 767 (9th Cir. 1993) dealt with the constitutionality of Washington's child support schedules. As provided by RCW 26.09.170(3), "[u]nless otherwise agreed in writing or expressly provided in the decree, provisions for the support of a child are terminated by emancipation of the child." *Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985) was an action for the wrongful death of a 14-year-old son. *In re Delaney*, 1980 OK 140, 617 P.2d 886, 890 was an action to terminate a mother's parental rights to her children. The decision does not reveal the ages of the children but we note that the Oklahoma Children's Code, as presently codified, defines "child" at 10A Okla. Stat. tit. 10A, § 1-1-105(7) as "any unmarried person under eighteen (18) years of age." *Mabra v. Schmidt*, 356 F. Supp. 620 (W.D. Wis. 1973) was a challenge to a prison policy that forbade children under age 18 from visiting prisoners housed in a segregation building. The petitioner's children were 2 and 3 years old.

ongoing problematic relationship with her mother that affects her ability to cope with the requirements of daily life, *requiring that her mother's time and contact with Kenyon be limited.*" CP at 342 (emphasis added). In addressing "Kenyon's contact with her mother," the proposed care plan went on to incorporate a detailed schedule and contact rules that Ms. Cloaninger had implemented. CP at 343, 345-46. Ms. Baldwin had two and a half months to respond to these terms of the care plan. She did respond. She was present in court and was heard on the limitations, which were squarely before the trial court for decision in connection with the proposed care plan. Even if we assume that Ms. Baldwin has some constitutional interest in the companionship of her daughter, then, she has not demonstrated any denial of her right to procedural due process.

### III. *Insufficient Time To Respond To Guardian Ad Litem Report*

Ms. Baldwin next argues that the trial court erred when it considered "the merits of the petition for guardianship" without allowing her sufficient time to respond to the guardian ad litem's report. Br. of Appellant at 1. Here, she points to language in RCW 11.88.090, which imposes a duty on a guardian ad litem to file its report and send copies to persons entitled to special notice "at least fifteen days before the hearing on [a] petition [for appointment of a guardian], unless an extension or reduction of time has been granted by the court for good cause." RCW 11.88.090(5)(f)(ix). It provides that if the guardian ad litem fails to file its report in a timely manner, "the hearing shall be

continued to give the court and the parties at least fifteen days before the hearing to review the report." RCW 11.88.090(7).

Ms. Baldwin did not make this argument in the trial court, either at the time of the hearing or by a motion for reconsideration. She argues that she complained about a lack of time to review the report, but she directs us to only her argument, in objecting to the personal care plan, that "we do not yet arrive at the question [of reinstatement]" because *the parties' agreement* (not a statute) required the guardian to submit a written report to the parties 15 days prior to the hearing. CP at 397. Ms. Baldwin never cited RCW 11.88.090(5)(f) as a basis for objection. While it is doubtful that RCW 11.88.090 even applies, the State argues that we should refuse to entertain the statutory argument for the first time on appeal. We agree.

Generally, appellate courts will not entertain issues raised for the first time on appeal. RAP 2.5(a); *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 441, 191 P.3d 879 (2008). The rule reflects a policy of encouraging the efficient use of judicial resources and refusing to sanction a party's failure to point out an error that the trial court, if given the opportunity, might have been able to correct to avoid an appeal. *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988); *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). As the lawyers and court had discussed in proceedings on March 23, the guardian ad litem report was relevant to approval of the personal care plan and Ms. Baldwin did not object when it was offered and admitted into evidence. Had

Ms. Baldwin raised a statutory objection that it was not timely for the purpose of the court rejecting Ms. Baldwin's reinstatement, the court might have afforded her the additional week she now contends was required by the statute in order to avoid an unnecessary appeal.

Ms. Baldwin raises her objection too late. She waived the issue and we will not consider it.

### IV. *Sufficiency of the Evidence*

Ms. Baldwin finally argues that "[t]he trial court's decision to remove the mother as guardian, to appoint Ms. Cloaninger guardian, and to give her 'great latitude' to limit contact between Ms. Cornelius and her mother was not supported by the evidence, was not in the best interests of Ms. Cornelius, and was erroneous." Br. of Appellant at 1.

With respect to "removal," Ms. Baldwin argues that the trial court failed to make a finding of "good reason" to replace Ms. Baldwin with Ms. Cloaninger, as required by RCW 11.88.120(1). The court did not need to find "good reason" because Ms. Baldwin, foreseeing a prospect that she would be removed, resigned in January 2011 in exchange for a promise of agreed conditions for reinstatement. If she regarded her resignation as a "removal," then the time to appeal that decision was in early 2011. Her notice of appeal did not identify the order accepting her resignation as a basis for appeal and, if it had, it would have been untimely. *See* RAP 5.2(a) (generally requiring appeal within 30 days after entry of the decision of the trial court that the appellant wants reviewed).

23

Ms. Baldwin advances literally no evidence or argument in support of a contention that appointment of Ms. Cloaninger as a replacement guardian was not supported by the evidence. We will not consider it. RAP 10.3(a)(6).

She finally challenges the trial court's decision to give Ms. Cloaninger "great latitude" to limit contact between Ms. Baldwin and her daughter.

In reaching its decision the trial court heard testimony from Mr. Woodard, Ms. Cloaninger, Mr. Cornelius, and Ms. Baldwin and reviewed the reports of Dr. Mary Dietzen, Dr. Gloria Waterhouse, Ms. Wahl, and Mr. Woodard. Having considered the evidence, the court explained:

> Ms. Baldwin, I found you to be a very nice lady. I have absolutely no, no doubt in my mind that you love your daughter dearly and your daughter loves you dearly and you have been her No. 1 advocate, not just for the years that you've been her guardian but from the minute that she was born here. And you continue to be an advocate for her, and you are obviously extremely smart. You're extremely intelligent. You're very well educated. I'm dead convinced you're well intentioned, and—very well intentioned. As I said, you're a highly educated person and you have made yourself extremely knowledgeable about every issue that surrounds Kenyon. You've researched and I think you've made yourself knowledgeable about a lot of the subject matter, probably more than some of the experts in the area, but I read the psychological evaluation, read Ms. Waterhouse's evaluation. I've heard all of this testimony here, including the testimony of the guardian and the guardian ad litem here, and then I heard your testimony. . . . The strongest evidence that corroborates what everybody else was saying was your own testimony. . . . [W]hat has been lacking here is just good old common sense and good judgment and insight and being a compassionate, caring mother. . . . [Y]ou take a stubborn, arrogant approach, and if anybody does not agree with you they're wrong, and there's no bending, and this has had a very, very adverse effect upon your daughter and her ability to relate with people that are trying to help her and

24

her progress here. And instead of having you involved as a guardian of her person or as the person that wants to oversee every minute detail of her caregiving and her life, and you do, she just needs you to be a mom, and that's difficult for you, and I understand that. . . . The issue of contact with the mother. What I've heard here from the guardian, the guardian ad litem, and everyone quite frankly except Ms. Baldwin here is that her time should be restricted. Her contact should be restricted or limited. But what everybody is saying, Ms. Baldwin, is that Kenyon needs to have a mother. She needs to have contact with you. She needs to enjoy her mother and not have her mother involved in—as Mr. Cornelius said, the minutia of controlling everything that she does or that gets done to her. . . . I didn't receive any specific recommendations, and I appreciate—guardian ad litem or guardian or anyone else as to how the contact should be limited other than the guardian ad litem I thought made a very good recommendation here, which was to seek out a professional recommendation and to seek that out from—it's Dr. Summerson; is that right?

. . . .

 . . . What I am going to do today at least until we can do something better as the personal care plan is concerned here is essentially give the guardian great latitude in handling the issues of restricting or limiting Ms. Baldwin's contact with Kenyon here because I am confident that she is looking out for the best interest of Kenyon and has some pretty good ideas as to what is in her best interest in that regarding [sic]. . . . I will direct her to get and to consider input from the professionals we have and particularly Dr. Summerson . . . . And when I say restrict or limit the mother's contact, I'm saying it with the view or a hope, a desire here for Kenyon, that it won't be a time restriction and that things ultimately will work out where mother and daughter can have a lot of time.

RP at 214-20.

All of the observations made in the trial court's ruling are supported by evidence in the record. Although there was conflicting evidence, this court will not resolve that conflict or substitute its judgment for that of the trial judge. *In re Marriage of Lutz*, 74 Wn. App. 356, 370, 873 P.2d 566 (1994). Substantial evidence is evidence of a sufficient

No. 30985-1-III
*In re Guardianship of Cornelius*

quantity to persuade a fair-minded, rational person of the truth of the declared premise. *Id.*

A "best interest" finding depends on the facts and circumstances of each case and a preponderance of the evidence must support it. *See In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). In reviewing a best interest finding, this court heavily relies on the trial court's determination of what is in the best interest of the ward. *See In re Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984).

Substantial evidence supported the trial court's decision to give great latitude to Ms. Cloaninger in limiting Ms. Baldwin's time and contact with Ms. Cornelius.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

26