# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| In the Matter of the Guardianship of: | No. 58601-1-II |
|---|---|
| F.S. | |
| A minor child. | PUBLISHED OPINION |

MAXA, J. – SS appeals the superior court's order granting Jessica Campbell's petition for appointment as the limited guardian of SS's three-year-old child, FS.

Campbell had been caring for FS since FS was 13 months old under an informal agreement with SS. When SS left the state, Campbell petitioned for the limited guardianship of FS. SS objected. She agreed that a limited guardianship for FS was necessary, but she proposed that Sophia Morales be appointed as guardian. Morales already was the guardian for SS's infant son, FS's half-brother.

RCW 11.130.215(2)(a) states, "The court shall appoint a person nominated as guardian by a parent of the minor in a probated will or other record unless the court finds the appointment is contrary to the best interest of the minor." The superior court expressed no concerns about Morales's ability to care for FS. However, the court found that placement with Morales was contrary to FS's best interest in part because FS had bonded with Campbell and removing FS from Campbell's care would result in significant trauma to FS. The court appointed Campbell as FS's limited guardian.

SS argues that (1) the superior court misapplied the decision-making framework for minor guardianship decisions under RCW 11.130.215(2)(a) by not honoring her guardianship preference after determining that it had no concerns about Morales's ability to care for FS, (2) substantial evidence does not support three of the court's findings of fact, and (3) the superior court's finding that appointing Morales as limited guardian was contrary to FS's best interest was an abuse of discretion.

We hold that (1) the superior court complied with RCW 11.130.215(2)(a) when it considered whether it would be contrary to FS's best interest to remove her from Campbell's care and place her with SS's nominated guardian, (2) either the challenged findings of fact are supported by the evidence or any unsupported findings are not relevant to the court's best interest determination, and (3) the court did not abuse its discretion when it found that it was contrary to FS's best interest to be placed with SS's nominated guardian. Accordingly, we affirm the superior court's order appointing Campbell as FS's limited guardian.

## FACTS

*Background*

Campbell first met SS online, and they met in person in July 2021. The first time Campbell saw FS, FS was in SS's home unattended. FS was screaming, crying, and covered in urine. When Campbell changed her diaper she noticed that FS had a severe diaper rash that had caused blisters and bleeding.

Campbell returned to SS's home a few days later and visited with SS and other adults for several hours. During this time, Campbell did not observe anyone feed, hold, or care for FS. Campbell was concerned because she had been there a long time and had not seen anyone

interact with FS.  Campbell found FS in her playpen with only a bottle of sweet tea.  FS's diaper was soiled and her car seat was infested with maggots.

Campbell spoke with SS and offered to help her take care of FS.  SS, who had only recently arrived in Washington, agreed to let Campbell take FS for a few days so she could settle in.  SS signed a waiver permitting Campbell to seek medical treatment for FS.  When Campbell took FS to the doctor, FS weighed less than 15 pounds and was in the 3rd growth percentile.

After the doctor's appointment, the Department of Children, Youth, and Families (DCYF) contacted Campbell and subsequently met with Campbell and SS.  During the meeting, it was agreed that Campbell would continue to provide care for FS while SS sought help for depression.  FS was 13 months old.

*Campbell's Guardianship Petition*

When Campbell received information suggesting that SS was preparing to leave the state, DCYF advised Campbell to petition for guardianship.  In April 2022, Campbell was appointed as FS's emergency guardian.

That same month, SS gave birth to KN, FS's half-brother.  SS immediately agreed to a guardianship of KN, and his paternal aunt Morales was appointed as his guardian.

In May 2022, nine months after bringing FS into her home, Campbell filed a petition for the limited guardianship of FS.[1]  According to Campbell, when she initially spoke with SS about seeking a formal guardianship, SS – who was then pregnant with KN – agreed that Campbell could petition for guardianship.  Around this time, Campbell attempted to assist SS with

---

[1] Originally, Campbell's housemate Cosette Craft-Austin was a co-petitioner.  But due to Craft-Austin's subsequent health issues, the petition proceeded to trial with Campbell as sole petitioner.

appointments related to her pregnancy, but SS was uncooperative and their relationship started to fail.

While FS was with Campbell, SS never initiated contact with FS, but Campbell would take FS to visit SS several times a week until SS "blocked" her. Rep. of Proc. (RP) at 60. Campbell eventually found out from a mutual friend that SS had left the state. Campbell had not had any communication with SS since then, and SS had not attempted to have any visitation with her daughter.

In her guardianship petition, Campbell alleged that FS had lived with SS from June 15, 2020 through August 2021, and then had lived with Campbell since August 2021. Campbell alleged that SS had limited mental capacity and was not capable of caring for herself, and that she did not have the income, ability, supplies, or housing needed to care for her daughter. Regarding FS's best interest, Campbell asserted that the child had been residing with her and in her care since August 2021, that FS had been starving when she came into Campbell's care, and that FS was now healthy and active. Campbell also asserted that FS had been living with Campbell's two daughters "as older sisters" to FS. Clerk's Papers (CP) at 22. Campbell argued that it was in FS's best interest that Campbell be declared FS's guardian rather than placing FS in foster care until SS was prepared to care for the child.

SS objected to the appointment of Campbell as FS's guardian and requested that the superior court appoint Morales as guardian. SS asserted that Campbell was not an appropriate guardian for FS because Campbell was not related to SS and did not have a long-term connection with FS. SS claimed that the allegations in Campbell's petition were false and that she did not believe that Campbell was as committed to maintaining a relationship between SS and FS as

Morales would be. SS also asserted that placement with Morales would allow FS and KN to be raised together and develop a sibling relationship.

The superior court appointed a guardian ad litem (GAL). SS never reached out to the GAL to arrange any visitation. But in late summer or early fall of 2022, the court ordered at least two visits between SS and FS. These visits occurred, and Morales attended the visits to meet FS and help SS with the visits.

*Superior Court Hearing*

During the hearing on the limited guardianship petition, Campbell testified consistent with her petition as described above. In addition, Campbell testified that FS currently was in the 57th growth percentile. Campbell stated that FS had had behavioral evaluations and soon would be starting occupational therapy to help correct various behavioral issues.

Campbell stated that she currently was living in a two bedroom apartment with her 14- and 16-year-old daughters and FS. FS shared a bedroom with one of Campbell's daughters, and Campbell slept in the living room.

The GAL testified that it was not in FS's best interest to be uprooted from Campbell's home, where FS had established relationships, and placed in a home where she did not have any established relationships. The GAL also testified that Campbell had provided a loving and stable home with consistent nurturing and that FS was doing well in the home. The GAL noted that FS currently was 35 months old, Campbell's home had been FS's home the majority of her life, and FS had bonded with Campbell.

The GAL further testified that Campbell and her two teenage children were available to FS in the home and that Campbell was aware of and was attempting to address any concerns about FS's developmental needs. In contrast, Morales worked full time and cared for FS's half-

brother KN, and neither Morales nor KN had established relationships with FS. The GAL concluded that because FS was in a guardianship-type relationship that previously was agreed to by the mother, there was no reason to disrupt FS's life and risk additional setbacks by placing her in an unfamiliar home with people she did not know.

The GAL stated that SS had never reached out to her to set up visitation with FS and that it was very difficult to reach SS by phone. The GAL noted that SS had started to return her calls only after moving out of state.

SS testified that despite previously having agreed to allow Campbell to care for FS, she now wanted Morales to be FS's guardian because Morales also was caring for KN and SS wanted the children to be together and form a close bond. SS also stated that she viewed Morales's custody of FS and KN as temporary until she was able to care for them.

SS stated that she currently was living in another state after leaving an abusive relationship with Morales's brother. When asked if she planned to return to live in Washington, SS responded that she did not.

SS also testified that she was in contact with Morales and that Morales would help her if she wanted contact or visitation with KN. SS further stated that Morales had taken good care of her son, so she believed that Morales also would be able to care for FS. SS also stated that she believed that visitation with FS would be easier if Morales rather than Campbell was FS's guardian. SS stated that Campbell had not been trying to get ahold of her lately and that she was more comfortable with visits facilitated by Morales.

Morales testified that she already was guardian for KN and was willing to take on the responsibility of serving as guardian for FS. Morales lived in Bellingham. She was the president of licensed care for the Boys and Girls Club of Whatcom County, overseeing five licensed

childcare sites. Morales was pursuing a master's degree in marriage and family therapy. She also had received training and education in early childhood development. Morales had been a foster parent over the years, and currently was caring for her 13-year-old nephew as well as KN and her own 13-year-old son.

Morales acknowledged that before the guardianship petition was filed she had only seen FS twice and had very little interaction with her. Subsequently, she facilitated two visits involving SS, FS, and Campbell.

Morales's plan for maintaining contact between SS and FS was to have several Zoom calls per week and to travel with FS to visit SS out-of-state one or two times per year.

Morales opined that FS was young enough that she could transition successfully from Campbell's home to Morales's home. She acknowledged that Campbell was an important person in FS's life and that regular visitation with Campbell could be set up.

*Guardianship Findings and Order*

The superior court granted Campbell's limited guardianship petition and appointed her as FS's limited guardian. The court concluded that it was contrary to FS's best interest to place her with Morales, SS's chosen guardian.

In its written findings, the superior court stated that SS had consented to the establishment of a limited guardianship but that she had not consented to appointment of Campbell as FS's guardian. The court found that a guardianship was needed because SS was "**not** willing or able to provide for the support, care, education, health, safety, and welfare of a child under age 18 (exercise the parenting functions in RCW 26.09.004)." CP at 220.

The superior court acknowledged that SS had objected to the appointment of Campbell as guardian and had proposed that Morales be appointed as guardian. And the court expressly

7

noted that under chapter 11.130 RCW, "the child shall be placed with the Guardian chosen by the parent, unless contrary to the best interest of the child." CP at 220.

Regarding the possible placement with Morales, the superior court found that Morales had relevant training, education, and experience in child development; that Morales had a substantial support network and access to resources necessary to address the challenges that might occur if FS was transitioned to her family; and that it had "no concerns about . . . Morales' ability to care for [FS]." CP at 220.

The superior court also noted SS's objections to Campbell serving as guardian: the relationship between SS and Campbell had broken down, Campbell smoked around FS, Campbell suffered from a degenerative liver disease, and Campbell had limited financial resources and lived in a small apartment with two other children.

But the superior court also found that FS had bonded with Campbell and her children; that Campbell had provided appropriate care; that FS had been "doing very well" in Campbell's care; and that it was in FS's "best interest to remain in an environment where she is receiving loving, stable, consistent, and nurturing care." CP at 221.

In addition, the superior court made the following findings regarding SS's future relationship with FS:

> K. [SS], the Mother, is no longer living in Washington state and testified she had no plans to return to Washington State. Her desire for particular placement to ease reunification with her children is unlikely to occur given that she has no plans to be in the same state as her children.
>
> L. While the Court has ongoing concerns about the break-down in the relationship between Ms. Campbell and the Mother, the Court is not confident that even if there was a better relationship that the Mother would re-engage with her daughter, [FS]. Over the course of the last two years, the Mother has not initiated any visits with [FS]. All the visits were arranged by either Ms. Morales, Ms. Campbell, or the GAL. Further, The Mother has subsequently moved to another state – significantly impairing her ability to visit or establish a bond with her young children. Because

> the Court finds the likelihood of the Mother engaging in visits or maintaining a relationship with her daughter would likely be only marginally improved if [FS] were placed with Ms. Morales, on-balance the Court finds that this concern does not outweigh the significant trauma to [FS] that would result from her being removed from Ms. Campbell's care.

CP at 221.

The superior court ultimately found,

> O. It is not in [FS's] best interest to suffer a change to her residential caregivers and have her endure another disruption of stability and break her current attachment with the Guardian to be placed in an unfamiliar home with her infant brother whom she has no relationship. [FS] has suffered significant early childhood trauma. The only stability, nurturing, or care that she has received appears to have come from Ms. Campbell. To compound the trauma to [FS] by removing Ms. Campbell from her life would not be in the best interest of [FS].

CP at 221-22. In conclusion, the court stated, "For all of the above reasons, the Court finds that it is contrary to the best interests of [FS] to place her with [SS's] chosen Guardian." CP at 222.

The superior court entered a residential schedule granting custody of FS to Campbell. However, the court ordered that Campbell and SS work out a schedule in which FS had two contacts per week with SS. In addition, the court ordered that with certain conditions, FS be allowed to travel to visit SS under the supervision of Morales. Finally, the court ordered that FS have visits with KN one weekend per month. The court also stated that Campbell should not smoke in FS's presence.

SS appeals the order appointing Campbell as FS's limited guardian.

ANALYSIS

A. LEGAL PRINCIPLES

In 2019, the legislature enacted the Uniform Guardianship, Conservatorship, and Other Protective Arrangements Act, chapter 11.130 RCW, with an effective date of January 1, 2021. LAWS OF 2019, ch. 437. This Act "completely overhaul[ed] the statutory framework for

9

guardianships in the state of Washington." *In re Guardianship of L.C.*, 28 Wn. App. 2d 766, 771, 538 P.3d 309 (2023).

> Under RCW 11.130.185(2), the superior court
>
> may appoint a guardian for a minor who does not have a guardian if the court finds the appointment is in the minor's best interest and:
> (a) Each parent of the minor, after being fully informed of the nature and consequences of guardianship, consents;
> (b) All parental rights have been terminated; or
> (c) There is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004.

The superior court found that subsection (c) applies here.

RCW 11.130.190(1) states, "A person interested in the welfare of a minor, including the minor, may petition for appointment of a guardian for the minor." If a guardianship petition is filed, the superior court is required to schedule a hearing on the petition. RCW 11.130.195(1). Under certain circumstances, attorneys may be appointed to represent a parent of the minor and/or the minor. RCW 11.130.200.

RCW 11.130.215(1) provides that after a hearing, the superior court has the authority to appoint a guardian for a minor if appointment is proper under RCW 11.130.185. The rules for appointing a guardian include the following: "The court shall appoint a person nominated as guardian by a parent of the minor . . . unless the court finds the appointment is contrary to the best interest of the minor." RCW 11.130.215(2)(a).

Chapter 11.130 RCW does not provide a standard of review for the superior court's decision regarding appointment of a guardian. *L.C.*, 28 Wn. App. 2d at 772. In *L.C.*, Division One of this court adopted an abuse of discretion standard of review. *Id.* We agree. As the court noted in *L.C.*, "[d]etermining who should be appointed as a child's guardian is a fact-intensive

inquiry that trial courts are necessarily in a better position than the appellate courts to decide."
*Id.*

Under the abuse of discretion standard, we will find error only if the "court's decision (1) adopts a view that no reasonable person would take and is thus manifestly unreasonable, (2) rests on facts unsupported in the record and is thus based on untenable grounds, or (3) was reached by applying the wrong legal standard and is thus made for untenable reasons." *Id.* (internal quotations and citations omitted).

We review the superior court's findings of fact for substantial evidence. *In re Guardianship of Cornelius*, 181 Wn. App. 513, 536, 326 P.3d 718 (2014). "Substantial evidence is evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *Id.*

*L.C.* is the only published case addressing RCW 11.130.215(2)(a). However, that case it is not instructive because, unlike here, the superior court in *L.C.* made no finding that placement with either of the parent-nominated guardians was contrary to the child's best interest. 28 Wn. App. 2d at 774. Division One reversed on that basis. *Id.* at 776.

B.      APPLICATION OF RCW 11.130.215(2)(a)

SS argues that the superior court misapplied RCW 11.130.215(2)(a) when it appointed Campbell as FS's limited guardian despite finding that it had no concerns about SS's nominee's ability to care for FS. We disagree.

SS argues that under RCW 11.130.215(2)(a), the superior court first must determine whether the parent-nominated guardian has the ability to adequately care for the child. At this stage, the court cannot engage in a comparison between the parent-nominated guardian and any other possible guardian. If the court finds that the parent-nominated guardian can adequately

care for the child, the inquiry ends and the court must appoint that guardian. According to SS, only if the court finds that the proposed guardian cannot adequately care for the child can the court then consider other possible guardians.

RCW 11.130.215(2)(a) does not support SS's interpretation. The statute gives the superior court the authority to appoint a guardian other than a parent's nominated guardian if placement with the parent's nominee is contrary to the child's best interest. Whether a nominated guardian is capable of providing adequate care and whether placing that child with the proposed guardian is contrary to the child's best interest are two distinct determinations. The former's focus is on the nominee's ability to meet the child's needs and the latter's focus is on the impact of the placement with the nominated guardian on the child in light of all of the child's circumstances. The fact a proposed guardian could provide adequate care does not automatically mean that placing a child with the proposed guardian would be in the child's best interest given the child's circumstances.

Chapter 11.130 RCW does not define the concept of the best interest of a child. In the parental termination context, determining the best interest of a child is based on "the unique facts of each case." *In re of Dependency of J.D.P.*, 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021). And "[o]ur case law dictates that the best interests of the child standard must take into account each individual circumstance of the child." *Id.* at 767. Accordingly, in determining whether something is or is not in a child's best interest, courts must consider the child's entire circumstances.

Under SS's interpretation, the superior court's analysis would be limited to a single factor – whether the nominated guardian can adequately care for the child. But this interpretation is incorrect because the superior court must be allowed to consider all the facts and circumstances

in determining the best interest of the child. Whether the nominated guardian can adequately care for the child certainly is a relevant factor, but it cannot be the only factor. Because FS already had an established relationship with Campbell, the impact of removing FS from Campbell's care was relevant to whether placement with Morales would be contrary to FS's best interest, and the court properly considered this factor in applying RCW 11.130.215(2)(a).

We decline to adopt SS's proposed interpretation of RCW 11.130.215(2)(a).

C.     CHALLENGES TO FINDINGS OF FACT

SS challenges portions of the superior court's findings of fact 9.K, 9.L, and 9.S. She argues that substantial evidence does not support these findings. And she contends that the court abused its discretion in finding that placement with Morales was contrary to FS's best interest because the court's decision was based on these unsupported factual findings, which she asserts affected the court's ability to adequately consider the importance of reunification. Although SS is correct that one of the findings is not fully supported by the evidence, she fails to demonstrate that the unsupported finding was relevant to the superior court's best interest finding.

1.     Finding of Fact 9.K

In finding of fact 9.K, the superior court found,

[SS], the Mother, is no longer living in Washington state and testified she has no plans to return to Washington State. *Her desire for particular placement to ease reunification with her children is unlikely to occur given that she has no plans to be in the same state as her children.*

CP at 221 (emphasis added).

SS argues that although the evidence supports the portion of the finding that she is currently in a different state and does not intend to return to Washington, this evidence does not demonstrate that she never intends to be in the same state as FS. She claims that the evidence that Morales intended to make yearly or twice-yearly trips to visit SS demonstrates that SS did

13

intend to be in the same state as her children. In addition, SS asserts that her testimony that she viewed Morales's custody of FS and KN as temporary until she was able to care for them, demonstrates that she intended to reunite with the children.

SS is correct that the record supports the conclusion that she planned to be in the same state as her children because Morales intended to take the children to see her in her out-of-state location once or twice a year. So the superior court erred to the extent if found that SS had no plans to ever be in the same state has her children.

But the evidence does not show that SS planned to *reside* in the same state has her children. At most, it showed that SS would be able to see FS once or twice a year if FS were placed with Morales. A fair-minded, rational person would not conclude that one or two in-person visits a year would be sufficient to reestablish a meaningful relationship with FS. Accordingly, we conclude that substantial evidence supports the superior court's ultimate finding that reunification was unlikely regardless of this error.

    2.    Finding of Fact 9.L

In finding of fact 9.L, the superior court found,

> While the Court has ongoing concerns about the break-down in the relationship between Ms. Campbell and [SS], the Court is not confident that even if there was a better relationship that [SS] would re-engage with her daughter, [FS]. Over the course of the last two years, [SS] has not initiated any visits with [FS]. All visits were arranged by either Ms. Morales, Ms. Campbell, or the GAL. Further, [SS] has subsequently moved to another state - significantly impairing her ability to visit or establish a bond with her young children. *Because the Court finds the likelihood of [SS] engaging in visits or maintaining a relationship with her daughter would likely be only marginally improved if [FS] were placed with Ms. Morales, on-balance the Court finds that this concern does not outweigh the significant trauma to [FS] that would result from her being removed from Ms. Campbell's care.*

CP at 221 (emphasis added).

SS argues that substantial evidence does not support a finding that the selection of Morales as FS's guardian would only marginally improve SS's relationship with FS. SS notes that the record shows that there was a complete breakdown in communication between her and Campbell, that Campbell made no attempts to facilitate contact during the pendency of the guardianship action, and that she (SS) would not feel comfortable having Campbell facilitate visitation. In contrast, the record shows that SS trusted Morales and that Morales had fostered a positive relationship between SS and KN, so the evidence shows that placement of FS with Morales would improve the relationship between FS and SS.

In addition, SS emphasizes that Morales testified about her plan to facilitate a relationship between SS and FS through frequent Zoom visits and one to two in-person visits a year, which would improve their relationship. And, given Morales' experience and background in child development and family therapy, there was evidence that her plan would be successful.

The superior court recognized that placement with Morales potentially could improve contact between SS and FS. But the court also found that SS's failure to maintain contact with FS during the previous two years demonstrated that SS herself was not engaging with FS and that SS's decision to move out of state further limited engagement with FS. Given SS's history and recent actions, we conclude that substantial evidence supported the court's finding that any potential increase in contact due to placement with Morales would be limited because SS herself was not taking steps to engage with FS.

3.    Finding of Fact 9.S

In finding of fact 9.S, the superior court found,

While there is a benefit to maintaining a sibling relationship when considering child placement, [FS] and her brother have no current relationship. [FS] was already placed before her half-brother was born. Placement based solely on creating a sibling relationship where no prior relationship existed could create future

15

problems. [FS] and her brother are half-siblings, and it is not guaranteed they will not have additional half-siblings at some time in the future. The Guardian will provide visitation with [FS's] sibling to ensure a sibling relationship is allowed to develop with less trauma than a relocation. *Further, [FS] has a bond and relationship with the children of Ms. Campbell, the loss of which would compound the trauma of a change in placement.*

CP at 222 (emphasis added).

SS argues that substantial evidence does not support a finding that FS has bonded with Campbell's children. SS contends that the testimony established only that FS had lived in the same household with Campbell's daughters and that they had shared a room. And SS contends that without any evidence of a bond between FS and Campbell's daughters, the superior court's finding that a loss of that relationship would compound any trauma caused by the change in placement is not supported.

The only direct evidence at the hearing of a bond between FS and Campbell's daughters is a reference in a DCYF November 2021 family assessment and care plan to a social worker observing FS interacting "excitedly" with one of Campbell's daughters during a home visit. Ex. 1 (Nov. 2021 FACP at 6). In addition, the guardianship petition stated that FS had been living with Campbell's two daughters "as older sisters" to FS. CP at 22.

The record also showed that FS had been with Campbell and her children for almost two-thirds of her young life, and a reasonable inference is that a bond had developed. Given this evidence, a fair-minded, rational person could conclude that FS had formed a bond with the individuals she lived with and that breaking that bond would contribute to the trauma of being removed from Campbell's care. Accordingly, we conclude that substantial evidence supports this finding.

D.        CHILD'S BEST INTEREST FINDING

SS argues that the superior court abused its discretion in finding that placement with Morales was contrary to FS's best interest. We disagree.

As noted above, the factors involved in determining the best interests of a child are not capable of specification. *J.D.P.*, 17 Wn. App. 2d at 767. Therefore, each case must be decided on its own facts and circumstances. *Id.* Accordingly, we place a strong reliance on the superior court's determinations of what action will be in the child's best interest. *Id.* And the standard of review is abuse of discretion. *L.C.*, 28 Wn. App. 2d at 772.

Here, because FS had been in Campbell's care approximately two-thirds of her life, a circumstance created by SS in the first instance, the superior court had to consider the effect of disturbing FS's current circumstances in order to determine whether placing her with Morales would be contrary to FS's best interest. The court found that FS had bonded with Campbell, and noted that the GAL recommended that FS remain with Campbell. The court referenced "the significant trauma to [FS] that would result from her being removed from Ms. Campbell's care." CP at 221. The court also found that "[t]he only stability, nurturing, or care that she has received appears to have come from Ms. Campbell. To compound the trauma to [FS] by removing Ms. Campbell from her life would not be in the best interest of [FS]." CP at 221-22.

SS argues that the superior court's concerns about possible trauma to FS were outweighed by the positive aspects of placement with Morales. SS contends that the positive aspects of placement with Morales included (1) the opportunity for FS to build a relationship with KN; (2) Morales's experience, education, and access to services could help FS with the transition and help reduce any trauma; and (3) Morales offered the only opportunity for SS to have a relationship with FS.

17

SS's argument ignores the fact that the superior court's order promoted the same benefits that she now asserts that Morales could provide while still maintaining FS's placement with Campbell and avoiding any trauma caused by a change of guardianship. For instance, the court ordered regular visitation between FS and KN to permit them to form a sibling relationship. The court also ordered regular supervised visitation between SS and FS and permitted Morales or an agreed-to third party to act as supervisor so SS was not required to have contact with Campbell unless SS chose to do so. And the court also permitted Morales to take FS to SS's out-of-state location to facilitate in-person visits. Accordingly, the court was able to ensure that FS would receive substantially the same benefits she would have received if she were to be placed with Morales while avoiding the trauma that would have been caused by removing FS from Campbell's care.

We conclude that the trial court did not abuse its discretion in finding that placement with Morales was contrary to FS's best interest.

## CONCLUSION

We affirm the superior court's order appointing Campbell as FS's limited guardian.

_____
MAXA, J.

We concur:

_____
VELJACIC, A.C.J.

_____
CHE, J.